IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BETH KLJAJIC and KATHLEEN CATES, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| | ) | Case No. 1:15-cv-05980 |
| Plaintiffs, | ) ) | |
| v. | ) | Honorable Amy J. St. Eve |
| | ) | |
| WHIRLPOOL CORPORATION, | ) ) | |
| Defendant. | ) ) | |

**DEFENDANT WHIRLPOOL CORPORATION'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

I.     WHIRLPOOL'S VISION II OVENS ........................................................................ 3

II.    THE OVENS DO NOT SHARE A UNIFORM "DESIGN" OR SUFFER A
COMMON "DEFECT" ............................................................................................. 4

       A.    The Ovens at Issue Have At Least 63 Materially-Different Designs .................... 4

       B.    Plaintiffs' Own Engineering Expert Admits that There Are "Many
Factors" that Enter into a Self-Cleaning Failure ...................................................... 6

       C.    Whirlpool Tested All of Its Ovens Before Sale and Then Undertook
Targeted and Successful Continuous Improvement Efforts ................................. 8

       D.    The Vast Majority of Ovens Never Experienced a Fuse Trip and, Among
the Small Percentage that Did, the Great Majority Were Successfully
Repaired ................................................................................................................... 9

III.   NAMED PLAINTIFFS' CONTRASTING EXPERIENCES REFLECT THE
MANY DIFFERENCES AMONG PUTATIVE CLASS MEMBERS ........................... 10

       A.    Plaintiffs' Ovens Differ in Material Ways .......................................................... 10

       B.    Plaintiffs' Pre- and Post-Purchase Experiences Differ in Material Ways ........... 12

            1.    Ms. Cates' KitchenAid Oven Operated Properly for 10 Years,
Then Whirlpool Reimbursed Her Repair Costs Nine Years Out of
Warranty ................................................................................................. 12

            2.    Ms. Kljajic's IKEA Oven Broke After Two Days, and Whirlpool
Went Beyond its Warranty Obligations by Providing a Free
Replacement Oven .................................................................................. 13

i

IV.     WHIRLPOOL'S COMMITMENT TO CUSTOMER SATISFACTION ...................... 15

ARGUMENT ........................................................................................................... 16

I.      STANDARDS FOR RULE 23 CLASS CERTIFICATION ............................................. 17

II.     PLAINTIFFS HAVE FAILED TO PROVE THE EXISTENCE OF ANY
COMMON QUESTIONS, MUCH LESS THAT COMMON QUESTIONS
PREDOMINATE OVER INDIVIDUAL ONES ...................................................... 18

         A.     Plaintiffs Cannot Prove the Existence of a Defect with Classwide
Evidence ...................................................................................... 19

                 1.     Plaintiffs Fail to Proffer Cognizable Evidence Showing a Uniform
Defect ........................................................................... 20

                 2.     Plaintiffs' Reliance on the *Butler* Decisions Is Misplaced ...................... 23

         B.     Plaintiffs Cannot Prove the Elements of Their Claims with Classwide
Proof ........................................................................................... 25

                 1.     Express Warranty Claims (Multi-State, Illinois Classes) ........................ 26

                 2.     Implied Warranty Claims (Illinois Classes) ................................. 29

                  3.     Unjust Enrichment Claims (Illinois, South Carolina Classes) .................. 31

                 4.     Consumer Fraud Claims (Illinois Classes) ................................ 33

III.    PLAINTIFFS CANNOT SATISFY RULE 23(B)(3) FOR THE ADDITIONAL
REASONS THAT THEY HAVE NOT PUT FORWARD A CLASSWIDE
DAMAGES MODEL, INDIVIDUAL QUESTIONS OF LAW PREDOMINATE,
AND CLASS TREATMENT IS NOT A SUPERIOR METHOD ................................. 36

         A.     Plaintiffs Have Not Put Forward a Damages Model Showing that
Damages Can Be Measured on a Classwide Basis ............................... 36

         B.     Plaintiffs Ignore Key Differences in the 16 States' Laws, Which Cause
Individual Issues of Law to Overwhelm Any Common Issues ........................... 38

         C.     A Class Action Is Inferior to Other Available Methods for the Fair and
Efficient Adjudication of This Controversy ....................................... 41

IV.    PLAINTIFFS HAVE FAILED TO PROVE TYPICALITY AND ADEQUACY ........... 43

         A.     Plaintiffs' Claims Are Not Typical of Any Proposed Class ................................. 43

B.      Plaintiffs' Claims Are Vulnerable to Unique Defenses ........................................ 44

C.      Plaintiffs Are Not Members of the Multi-State and South Carolina Classes
        They Seek to Represent and, Thus, Are Not Adequate Representatives .............. 46

V.      Plaintiffs' Alternative Request for Certification under Rule 23(b)(2) Fails ..................... 47

VI.     Plaintiffs' Alternative Request for Certification of an Issues-Only Class Fails ............... 50

CONCLUSION ............................................................................................................................. 50

# **TABLE OF AUTHORITIES**

## CASES

*Alvarez v. Am. Isuzu Motors*,
    749 N.E.2d 16 (Ill. App. Ct. 2001) ................................................................. 33

*Am. Express Co. v. Italian Colors Rest.*,
    133 S. Ct. 2304 (2013) ................................................................................... 18

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. at 625 (1997) ................................................................................... 52

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    133 S. Ct. 1184 (2013) ................................................................................... 46

*Baldwin v. Star Sci., Inc.*,
    78 F. Supp. 3d 724 (N.D. Ill. 2015) ......................................................... 32, 53

*Barbara's Sales, Inc. v. Intel Corp.*,
    879 N.E. 2d 910 (Ill. 2007) ....................................................................... 36, 39

*Bietsch v. Sergeant's Pet Care Prods., Inc.*,
    No. 15 C 5432, 2016 WL 1011512 (N.D. Ill. Mar. 15, 2016) ........................ 34

*Brown v. Electrolux Home Prods., Inc.*,
    817 F.3d 1225 (11th Cir. 2016) ..................................................................... 19

*Butler I*,
    702 F.3d 359 (7th Cir. 2012) .................................................................... 1, 26

*Butler II*,
    727 F.3d 796 (7th Cir, 2013) ................................................................. passim

*Canadian Pac. Ry. Co. v. Williams-Hayward Protective Coatings, Inc.*,
    No. 02 C 8800, 2005 WL 782698 (N.D. Ill. Apr. 6, 2005) (St. Eve, J.)................. 31

*Carlson v. Gen. Motors Corp.*,
    883 F.2d 287 (4th Cir. 1989) ......................................................................... 28

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ........................................................................... 57

*Castro Valley Union 76, Inc. v. Vapor Sys. Techs., Inc.*,
    No. C 11-0299 PJH, 2012 WL 5199458 (N.D. Cal. Oct. 22, 2012) ................. 29

*Caterpillar, Inc. v. Usinor Industeel*,
   393 F. Supp. 2d 659 (N.D. Ill. 2005) ................................................................ 45

*CE Design Ltd. v. King Architectural Metals, Inc.*,
   637 F.3d 721 (7th Cir. 2011) ....................................................................... 50

*Clay v. Am. Tobacco Co.*,
   188 F.R.D. 483 (S.D. Ill. 1999) ..................................................................... 35

*Cole v. Gen. Motors Corp.*,
   484 F.3d 717 (5th Cir. 2007) ....................................................................... 45

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ......................................................................... passim

*Connick v. Suzuki Motor Co.*,
   675 N.E.2d 584 (Ill. 1996) ..................................................................... 34, 39

*Cunningham Charter Corp. v. Learjet, Inc.*,
   258 F.R.D. 320 (S.D. Ill. 2009) .................................................................... 43

*Dailey v. Groupon, Inc.*,
   No. 11 C 05685, 2014 WL 4379232, (N.D. Ill. Aug. 27, 2014) ............................................ 43

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ............................................................................. 21

*De Bouse v. Bayer AG*,
   922 N.E.2d 309 (Ill. 2009) .................................................................. 38, 50, 51

*Doyle v. Chrysler Grp., LLC*,
   No. 15-55107, ___ F. App'x ___ 2016 WL 6156062 (9th Cir. Oct. 24, 2016) ...................... 40

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) ............................................................................. 27

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ......................................................................... 19, 52

*Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.*,
   684 S.E.2d 756 (S.C. 2009) ................................................................... 35, 52

*Glazer v. Whirlpool Corp.*,
   722 F.3d 838 (6th Cir. 2013) ....................................................................... 25

*Haley v. Kolbe & Kolbe Millwork Co.*,
  14-cv-99-bbc, 2015 WL 9255571 (W.D. Wis. Dec. 18, 2015) ................................................ 30

*Harnish v. Widener Univ. Sch. of Law*,
  833 F.3d 298 (3d Cir. 2016) ........................................................................................... 42

*Holmes v. Godinez*,
  311 F.R.D. 177 (N.D. Ill. 2015) ...................................................................................... 10

*In re Am. Med. Sys., Inc.*,
  75 F.3d 1069 (6th Cir. 1996) ..................................................................................... 47, 49

*In re Bridgestone/Firestone, Inc.*,
  288 F.3d 1012 (7th Cir. 2002) ................................................................................... 23, 43

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
  Master File No. 09 CV 3690, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) .......................... 54

*In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*,
  241 F.R.D. 305 (S.D. Ill. 2007) ................................................................................. 46, 57

*In re Rhone-Poulenc Rorer, Inc.*,
  51 F.3d 1293 (7th Cir. 1995) .................................................................................... 44, 57

*In re Yasmin & Yaz (Drospirenone) Mktg. Sales Prac. & Relevant Prods. Liab. Litig.*,
  275 F.R.D. 270 (S.D. Ill. 2011) ................................................................................. 31, 58

*In re: Gen. Motors Type III Door Latch Litig.*,
  Nos. 98 C 5836, MDL 1266, 2001 WL 103434 (N.D. Ill. Jan. 31, 2001) ............................... 32

*Jamie S. v. Milwaukee Pub. Sch.*,
  668 F.3d 481 (7th Cir. 2012) .................................................................................... 20, 56

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
  634 F.3d 883 (7th Cir. 2011) .................................................................................... 55, 56

*Keele v. Wexler*,
  149 F.3d 589 (7th Cir. 1998) ......................................................................................... 53

*Kunzelmann v. Wells Fargo Bank, N.A.*,
  No. 9:11-cv-81373-DMM, 2013 WL 139913 (S.D. Fla. Jan. 10, 2013) ................................. 33

*Langendorf v. Skinnygirl Cocktails, LLC*,
  306 F.R.D. 574 (N.D. Ill. 2014) ...................................................................................... 43

*Maloney v. Microsoft Corp.*,
  Civ. No. 09-2047, 2012 WL 715856, (D.N.J. Mar. 5, 2012)...................................................... 24

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012) ......................................................................................... 24

*Marshall v. H & R Block Tax Servs. Inc.*,
  270 F.R.D. 400 (S.D. Ill. 2010) ..................................................................................... 55

*Martin v. Ford Motor Co.*,
  292 F.R.D. 252 (E.D. Pa. 2013)...................................................................................... 30

*McIntyre v. Household Bank*,
  No. 02 C 1537, 2004 WL 2958690, (N.D. Ill. Dec. 21, 2004) ................................................ 52

*Mednick v. Bayer*,
  Case No. 14 C 3624, 2014 WL 6474915 (N.D. Ill. Nov. 13, 2014) ........................................ 31

*Mednick v. Precor, Inc.*,
  Case No. 14 C 3624, 2016 WL 3213400, (N.D. Ill. June 10, 2016)...................... 21, 22, 24, 55

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) .................................................................................. 10, 21

*Miller v. William Chevrolet/GEO, Inc.*,
  762 N.E.2d 1 (Ill. App. Ct. 2001) ................................................................................... 38

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) ......................................................................................... 56

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001) ......................................................................................... 42

*Oshana v. Coca-Cola Co.*,
  472 F.3d 506 (7th Cir. 2006) .................................................................................. 49, 52

*Parko v. Shell Oil Co.*,
  739 F.3d 1083 (7th Cir. 2014) ............................................................................ 2, 18, 19, 26

*Pastor v. State Farm Mut. Auto. Ins. Co*,
  487 F.3d 1042 (7th Cir. 2007) ....................................................................................... 48

*Pella Corp. v. Saltzman*,
  606 F.3d 391 (7th Cir. 2010) ................................................................................... 56, 57

*Randall v. Rolls-Royce Corp.*,
  637 F.3d 818 (7th Cir. 2011) ................................................................... 50

*Reid v. Unilever U.S., Inc.*,
  964 F. Supp. 2d 893 (N.D. Ill. 2013) ................................................. 32, 38

*Retired Chi. Police Ass'n v. City of Chi.*,
  7 F.3d 584 (7th Cir. 1993) ....................................................................... 49

*Robinson v. Gen. Elec. Co.*,
  Case No. 09-cv-11912, 2016 WL 1464983, (E.D. Mich. Apr. 14, 2016) ............... 22

*Rosario v. Livaditis*,
  963 F.2d 1013 (7th Cir. 1992) .................................................................. 49

*Saltzman v. Pella Corp.*,
  257 F.R.D. 471 (N.D. Ill. 2009) ............................................................... 56

*Schiffner v. Motorola, Inc.*,
  697 N.E.2d 868 (Ill. App. Ct. 1998) ....................................................... 32

*Siegel v. Shell Oil Co.*,
  256 F.R.D. 580 (N.D. Ill. 2009) ......................................................... 43, 45

*Siegel v. Shell Oil Co.*,
  612 F.3d 932 (7th Cir. 2010) ............................................................. 35, 39

*Siegel v. Shell Oil Co.*,
  656 F. Supp. 2d 825 (N.D. Ill. 2009) ....................................................... 51

*Snyder v. Komfort Corp.*,
  No. 07 C 1335, 2008 WL 2952300, (N.D. Ill. July 30, 2008) ......................... 51

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) ............................................................. 10, 40

*Thorogood v. Sears, Roebuck & Co.*,
  547 F.3d 742 (7th Cir. 2008) .................................................................. 37

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ...................................................................... 19, 20

*Vazquez v. Ferrara Candy Co.*,
  No. 14 C 4233, 2016 WL 4417071, (N.D. Ill. Aug. 19, 2016) ......................... 42

*Verb v. Motorola, Inc.*,
    672 N.E.2d 1287 (Ill. App. Ct. 1996) ............................................................ 32

*Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*,
    274 F.R.D. 229 (S.D. Ill. 2011) .................................................................... 48

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................ passim

**STATUTES**

15 U.S.C. § 2303 ...................................................................................... 26

15 U.S.C. § 2304 ...................................................................................... 26

**OTHER AUTHORITIES**

S.C. Code Ann. § 15-3-640 (2016) ............................................................ 46

S.C. Code Ann. § 22-3-10............................................................................ 42

**RULES**

Federal Rule of Civil Procedure 23 ....................................................... passim

Ill. Sup. Ct. R. 281 .................................................................................. 42

## INTRODUCTION

Plaintiffs' Motion for Class Certification ("Motion") asks this Court to certify five discrete damages classes, two injunctive relief classes (in the alternative), and an untold number of issues (again, in the alternative) based on four distinct kinds of claims brought under the laws of 18 states. Plaintiffs' Motion is premised on a supposedly uniform design defect in all of Whirlpool's Vision II Ovens ("Ovens")—a group of more than two million ovens built on 322 different base models with at least 63 material design differences and manufactured over the course of the last 20 years. The Motion is fundamentally at odds with Federal Rule of Civil Procedure 23's core tenants of efficiency and manageability, and it should be denied.

Although Plaintiffs claim the Ovens contain a uniform defective design that causes the Ovens' safety fuses to trip during a self-clean cycle and that uniformly harms purchasers, they have failed to provide *any* credible classwide evidence of a uniform design defect. ███████ ████████████████████████████████████████████████████████ ████████████████████████████████████ Nor have Plaintiffs proffered *any* damages model, let alone one that suggests classwide damages are measurable with common evidence. Rigorous analysis of the uncontroverted record establishes that this case presents *only* individual questions and certainly does not present common questions that predominate over individual ones.

In an effort to overcome these obvious deficiencies in their proof, Plaintiffs rely heavily on the Seventh Circuit's *Butler v. Sears, Roebuck & Co.* opinions. (*See* Pls.' Mem. in Support of Mot. ("Mem.") at 13, 20-21, 23-24, 33 (citing *Butler I*, 702 F.3d 359 (7th Cir. 2012); *Butler II*, 727 F.3d 796 (7th Cir, 2013)), ECF No. 114.) Plaintiffs' reliance on *Butler* is unavailing, as the plaintiffs there cleared the threshold evidentiary hurdle of presenting at least some classwide proof of a common defect that ran through all models at issue and some classwide proof of

shared causation to support their theory of classwide injury. Here, Plaintiffs fail to present *any* credible classwide proof of a common cause, common defect, or common injury. Indeed, the evidence shows that the Ovens can experience a trip during self-clean for a variety of non-design-related reasons. Plaintiffs' engineering expert admits that (1) he does not know what caused the different fuses to trip in the two different Ovens he tested, (2) each fuse trip was likely the result of a different cause, and (3) he would need to (but did not) tear apart each Oven to test any hypotheses about causation. As the Seventh Circuit has held, "[m]ere *assertion* by class counsel that common issues predominate is not enough." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014).

Lack of commonality and predominance notwithstanding, Plaintiffs' proposed classes suffer from a number of other fatal flaws. All five damages classes fail because the class representative is atypical and inadequate. Four of the damages classes and both injunctive relief classes also fail because the class representatives are not members of the classes they seek to represent. Finally, Plaintiffs' alternative request for certification under Rule 23(b)(2) fails because that request is a thinly-veiled attempt to obtain individualized monetary relief and, in any event, Plaintiffs cannot establish that the class would provide "final" relief as required by Rule 23(b)(2) or that they can satisfy the test for a remedy in equity.

In short, Plaintiffs fail to meet the requirements of Federal Rule of Civil Procedure 23. Their motion for class certification should be denied.

## STATEMENT OF FACTS[1]

### I. WHIRLPOOL'S VISION II OVENS

The Ovens were each manufactured by Whirlpool on the Vision II platform—meaning they share a common architectural structure, like the frame of a house—and sold to retailers for re-sale from 1998 to the present.[2] (*See* Decl. of Mr. S. Ohlsson ("Ohlsson Decl.") ¶ 4, Def.'s Subm. Ex. B.) That is where the Ovens' similarities end. The Ovens span three different brands (KitchenAid, Whirlpool, and IKEA) and include 322 different base models with 63 materially-different designs that are directly relevant to the Plaintiffs' certification theories. (*Id.* ¶ 4, 21; Def.'s App. of Design Variations.)

These design differences relate, in part, to the following technical components and concepts, which impact temperature margins and repair rates and are discussed in detail throughout this brief:

- **Width**: refers to the width of the entire oven as measured by the oven door. Three widths (24", 27", 30") are relevant in this case depending on brand and year of manufacture.

- **Configuration**: three configurations are relevant in this case: (1) single (one oven installed into the wall or under a counter or cooktop); (2) double (two ovens with common control panel, installed into the wall); and (3) combination (oven, and microwave with common control panel, installed into the wall).

- **Cooling fan**: a "fan" or "blower" typically mounted to the rear of the top back of the oven; ███████████████████████████████████████████████████████

---

[1] The Ovens at issue are complex machines that have undergone significant changes over the last 20 years. To facilitate this Court's review of the technical engineering aspects of this case, Whirlpool provides a high-level narrative explanation in this brief, followed by additional visual and textual detail in its appendices, and in-depth explanations in its supporting declarations.

[2] With limited exceptions, Whirlpool does not sell Ovens directly to end-user consumers; rather, Whirlpool manufactures, distributes, and sells its ovens to trade customers who then resell the Ovens to end-user consumers. (*See* Def. Whirlpool Corp.'s Resp. to Pls.' 1st Set of Requests for Prod. of Docs. & ESI 27, Def.'s Subm. Ex. A.) "Def.'s Subm." refers to the Declaration of David Jin Submitting Evidence in Support of Defendant Whirlpool Corporation's Opposition to Plaintiffs' Motion for Class Certification and Motions to Exclude the Expert Opinions of Albert L. De Richemond and Professor Nozer D. Singpurwalla Under Federal Rule of Evidence 702, filed contemporaneously with this opposition.

████████████████████████████, depending on Oven brand, configuration, and date of manufacture. Double ovens have two cooling fans (one near the top of each oven cavity; the lower cavity fan ███████████, while the upper cavity fan varies), and all single ovens have only one cooling fan.

- **User interface**: the area on the front of the oven where a consumer can select various oven functions (such as self-clean) by touching buttons or turning knobs, depending on the oven brand.

- **Therm-O-Disk or TOD**: a safety fuse found in all Ovens typically mounted on the back of the Oven's outer shell near the top of the cavity. ███████████ ████████████████████████████████████████████████ Double ovens have two TODs (one on each cavity), while single ovens have only one TOD. If temperatures exceed the TOD's set point it will trip and cut power to the oven's heating element so that it will cool down.

- **Thermal-fuse**: a safety fuse found in some Ovens typically mounted in a wire harness in the top front of the oven near the Oven's electronic control board, ████████████████████████████████████████████ If the thermal-fuse trips, power to the entire oven is cut, including the heating element so that it will cool down.

- **Temperature margin**: the difference between the maximum temperatures reached during a particular oven cycle (e.g., self-clean) and the allowable temperatures of the oven's components (e.g., the user interface).

- **Nuisance trip**: a phrase sometimes used to describe a thermal-fuse or TOD trip during a self-clean cycle where the temperature margin intended by design is overcome by a factor or combination of factors unique to a particular unit at a particular time. For example, a "nuisance trip" occurs if the unit's components all work properly but the oven was improperly installed, leading to a blocked exhaust vent and the thermal-fuse or TOD tripping due to compromised circulation.

(Ohlsson Decl. ¶ 4.) For additional detail about how differences in these components impact

temperature margins and the risk of tripping, see Defendant's Appendix of Design Variations.

## II.  THE OVENS DO NOT SHARE A UNIFORM "DESIGN" OR SUFFER A COMMON "DEFECT"

### A.  The Ovens at Issue Have At Least 63 Materially-Different Designs

Notwithstanding Plaintiffs' myopic focus on the Ovens' shared "platform" (Mem. at 2),

the Ovens have far more relevant differences. They were built on 322 different base models with

different features, oven configurations, widths, TODs, thermal fuses, cooling fans, user

interfaces and controls, door hinges, door latches, door configuration, exhaust vents, or component configuration in the control area. (Ohlsson Decl. ¶¶ 19, 21-22, Tbl. 1; Expert Rep. of Paul M. Taylor, Ph.D., P.E. ("Taylor Rep.") ¶¶ 27-33, Fig. 12, Def.'s Subm. Ex. D.)

The differences are material, meaning that each design difference, whether considered individually or in various combinations, influences the propensity of any given Oven to experience a trip. For example, each feature impacts air flow and thermal management in a meaningful but different way, which in turn impacts whether an Oven may experience a trip. (*See id.* ¶¶ 25-30; Expert Rep. of Dr. Rose Ray ("Ray Rep."). ¶¶ 8-14, 16, Def.'s Subm. Ex. C; Taylor Rep. ¶¶ 37, 22-27.) Many different sources confirm the materiality of these design differences. (*See* Def.'s App. of Design Variations, Ex. 3.) ███████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████

Plaintiffs' own engineering expert, Albert de Richemond, does not dispute this. (*See* Rep. of Albert de Richemond ("de Richemond Rep."), Def.'s Subm. Ex. F.) To the contrary, by identifying 19 design factors involving eight different components as contributors to tripping, Mr. de Richemond acknowledges that the Ovens differ in many important respects.[4] (*See* Rebuttal Rep. of Albert de Richemond ("de Richemond Rebuttal Rep.") 1, 3-4, Def.'s Subm. Ex. G.)

---

[3] "Target Parts" refers to the thermal fuse, TOD, or service kits, all of which are identified in Appendix B of Dr. Ray's report. (*See* Ray Rep. 8, 18.)

[4] Despite admitting to significant design differences, Mr. de Richemond has made no meaningful attempt to understand or account for them. (*See, e.g.*, Dep. of Albert de Richemond ("de Richemond Dep.") 198:13-20, 229:4-13 (admitting that he does not know (1) whether the electronic configuration of the single model of IKEA Oven he inspected differed from that of Ms. Cates's 2004 KitchenAid Oven, or (2) why Technical Service Pointers were made for particular Oven models), Def.'s Subm. Ex. E.)

These differences are evident both between and within brands. 

(Ohlsson Decl. ¶¶ 23-24, Tbl. 1)

(*Id.*)

Moreover, there are at least 37 different designs just <u>within</u> the Whirlpool brand, at least 16 different designs <u>within</u> the KitchenAid brand Ovens, and at least 10 materially-different designs <u>within</u> the IKEA brand. (Def.'s App. of Design Variations, Ex. 2.) Indeed, IKEA-brand Ovens differ just among themselves by configuration (single vs. double), thermal fuse in control area (no fuse vs. fuse), configuration in control area (mounting plate vs. no mounting plate), blower (no internal thermal fuse vs. internal thermal fuse), and control panel and vent design. (*Id.* ¶¶ 40, 43-44, 54, 57, 78, 83.).

In other words, Plaintiffs are attempting to certify a class of ***at least*** 63 materially-different designs, as illustrated below and detailed in Defendant's Appendix of Design Variations.

### B. Plaintiffs' Own Engineering Expert Admits that There Are "Many Factors" that Enter into a Self-Cleaning Failure

The undisputed evidence shows that there are many independent, non-design related reasons why a particular Oven's safety fuses might trip during a self-clean cycle.[5] (*See e.g.* Taylor Rep. ¶¶ 43-45, 51-66; Ohlsson Decl. ¶¶ 96-107.) These causes include things that are

---

[5] These fuses are intended to trip before an Oven reaches temperatures that could pose a danger, regardless of the cause of overheating. (Ohlsson Decl. ¶¶ 7-12; Taylor Rep. ¶ 73.)

within Whirlpool's control, such as one-off deviations during the manufacturing process, as well as things that are outside of Whirlpool's control, such as power interruptions during the self-clean cycle, improper installation,[6] and low voltage in the consumer's home. (Taylor Rep. ¶¶ 56-61; Ohlsson Decl. ¶¶ 98, 107.) They can be also the product of wear and tear, such as a door gasket that loses its seal and allows hot air to escape into the cooling air stream. (Taylor Rep. ¶¶ 63-66.) Fuse trips that result from any of these circumstances are not the result of Plaintiffs' alleged design defect.

Plaintiffs do not dispute that there are many different potential causes of tripping. To the contrary, Mr. de Richemond agrees that there are "many" causes of a given trip: "[T]he common defect is that these ovens fail during a self clean and the cause of the failures are many." (de Richemond Dep. at 204:6-9 (emphasis added).) Moreover, in addition to opining that the Ovens have "several design issues that combine to cause the Ovens to fail during self cleaning" (Mem. at 3 (quoting Rebuttal Rep. at 1)), Mr. de Richemond concedes that he does not even know what caused the fuses of either named Plaintiffs' Ovens to trip and that they were likely due to different causes:

> Both of [Plaintiffs'] ovens had the common problem in that during self-clean cycle, the oven shut itself down and became unusable. As to what caused it in each case, I don't think that's been fully determined yet. . . . They're probably two different things. There are many factors that enter into causing this common failure and they could be different. They could be the same. No one has determined that yet.

(de Richemond Dep. at 219:13-220:24 (emphasis added).)



Indeed, he testified that he would have to (but did not) tear apart each Oven to determine the reason for its failure. (*Id.* at 221:1-7.) The reason for this concession—which came after examining just two Oven models out of the 322 base models at issue—is simple: design and feature differences among the various Oven models are material.

### C. Whirlpool Tested All of Its Ovens Before Sale and Then Undertook Targeted and Successful Continuous Improvement Efforts

Whirlpool extensively tested the Ovens pursuant to Underwriters Laboratory ("UL") 858, the safety standard that requires manufacturers to meet certain temperature-management standards to ensure that ovens do not overheat to the point of posing a danger to people or property. (Ohlsson Decl. ¶¶ 7-12.) UL 858 includes maximum allowable temperatures for oven and cabinet surfaces and for electronic components internal to the oven. (*Id.*) The thermal-fuse and TOD function must meet UL 858's standards by cutting power to an oven or its heating elements before either reaches temperatures that exceed UL 858's limits. (*Id.* ¶ 12.)

Whirlpool's UL 858 testing of the Ovens uniformly showed healthy margins between maximum airflow temperatures during self-clean cycles and allowable temperatures of the electronics and the set points of the fuses. (Ohlsson Decl. ¶¶ 13-18, 36, 40, 42, 48, 55, 57.) Indeed, across all of the UL 858 "normal temperature" tests that Whirlpool ran on the Ovens and submitted to UL for approval, not a single thermal fuse or TOD tripped during the self-clean cycle. (*Id.* ¶ 18.) Critically, Plaintiffs do not challenge the methodology or results of this testing.[7]

Whirlpool's commitment to Oven performance did not end after the Ovens successfully passed UL 858. As part of Whirlpool's efforts to continuously improve the safety, reliability and

---

[7] Instead, they ignore that the test results conclusively disprove their expert's theory that "[t]he design should have been such that the airflow channel temperature would not exceed the allowable operating temperature of the electronics." (de Richemond Rep. 10.) In fact, Plaintiffs make no attempt to explain how ovens that meet UL 858's temperature-margins requirement somehow also possess a design defect.

performance of its products, it has investigated many opportunities to optimize Oven performance in the field. (Ohlsson Decl. ¶¶ 58-59.) Some of these investigations led to the creation of Technical Service Pointers, which provide technical guidance to third-party servicers both to remedy specific issues that can cause fuse tripping during self-clean and to increase temperature margins. (*Id.* ¶ 60.) The Technical Service Pointers were tailored to specific Oven designs and addressed a variety of unique manufacturing, supplier, installation, and environmental issues. Far from supporting Plaintiffs' claim that the Technical Service Pointers evidence Whirlpool's "[k]nowledge of the [d]efect" (Mem. at 6), they demonstrate the <u>absence</u> of a uniform defect and show that Whirlpool's knowledge of what might cause a particular Oven's fuse to trip changed over time and depended on the specific model at issue.[8] (Ohlsson Decl. ¶¶ 60, 62, 64-66, 70, 76-77, 80, 84.)

> **D. The Vast Majority of Ovens Never Experienced a Fuse Trip and, Among the Small Percentage that Did, the Great Majority Were Successfully Repaired**

Whirlpool's claims and customer contacts data show that the vast majority of putative class members have never experienced a fuse trip during the self-clean cycle and never will. (*See, e.g.*, Taylor Rep. ¶ 115; Ohlsson Decl. ¶ 59 (███████████████████████████████████████████████), Decl. of Maxwell A. Murray ("Murray Decl.") ¶ 20 (████████████████████████████████████████████████████████████████████████████), Def.'s Subm. Ex. I.)[9] Plaintiffs' experts have made no attempt to show how these rates

---

[8] Indeed, Plaintiffs' proffered statistical expert, Professor Singpurwalla, agrees that such continuous quality improvement efforts are "absolutely" a good practice and that improvements do not indicate that the original product was defective because there can be business reasons to improve on a "completely good robust design," such as trying to increase "market share." (Dep. of Nozer D. Singpurwalla, Nov. 9, 2016 ("Singpurwalla Dep. II") at 105:2–107:3, 116:19–117:17, Def.'s Subm. Ex. H.)

[9] It is unclear whether Plaintiffs' proposed damages classes include the overwhelming majority of Oven owners who have never experienced tripping. (*Compare* Mem. at 9-10, 13, 29, *with id.* at 34-35.) Absent a clear indication that these individuals are excluded from the damages classes, this Court should deny certification because an overwhelming majority of putative class members cannot prove injury—a

are "too high"; indeed, neither expert could identify an objective standard upon which they could rely for such a conclusion. (*See* de Richemond Dep. at 34:1–35:14, 138:25–139:24; Dep. of Nozer D. Singpurwalla, Nov. 1, 2016 ("Singpurwalla Dep. I"), 87:19-88:7, Def.'s Subm. Ex. K; Singpurwalla Dep. II at 87:17-19.)

Moreover, the evidence shows that among the small percentage of Ovens that have experienced fuse tripping, the great majority are successfully repaired on the first attempt. █████

███████████████████████████████████████████████████

█████████████████ (Ohlsson Decl. ¶ 108; *see also id.* ¶ 91.) The fact that some Ovens require no repairs, which others require more than one repair, or are seemingly immune to repair, speaks to the individualized nature of this action.

## III. NAMED PLAINTIFFS' CONTRASTING EXPERIENCES REFLECT THE MANY DIFFERENCES AMONG PUTATIVE CLASS MEMBERS

### A. Plaintiffs' Ovens Differ in Material Ways

Although Plaintiffs Cates and Kljajic both own Ovens built on the Vision II platform, their Ovens differ in critical respects relevant to self-clean performance, as shown below.[10]

---

required element of their claims. *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014) (explaining that certification is not proper in "a case where few, if any, of the putative class members share the named representative's grievance against the defendant"); *Holmes v. Godinez*, 311 F.R.D. 177, 216 (N.D. Ill. 2015) (suggesting that denial of certification is appropriate if it is apparent that "a great many" individuals in the class were not injured (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012))).

[10] Unless otherwise indicated, all information in the below table is from the Ohlsson Declaration, Table 1.

---

[11] Decl. of Paula A. Haines ("Haines Decl."), Def.'s Subm. Ex. L.

[12] *See* Taylor Rep. ¶ 78 & Fig.27.

[13] *See* Ray Rep. 13 Tbl.5.

11

**B.      Plaintiffs' Pre- and Post-Purchase Experiences Differ in Material Ways**

1.      Ms. Cates' KitchenAid Oven Operated Properly for 10 Years, Then Whirlpool Reimbursed Her Repair Costs Nine Years Out of Warranty

In 2014, Ms. Cates bought a KitchenAid-brand double Oven from Queen City Appliances in North Carolina. (Dep. of Kathleen Cates ("Cates Dep.") 10:5-9, 10:22-25, 15:23–16:1, Def.'s Subm. Ex. M.) She bought this Oven, which was installed into the kitchen cabinets in her South Carolina home, in part to increase the value of her home on resale. (*Id*. at 31:1-9, 39:15–40:1.) Prior to buying her Oven, Ms. Cates <u>did not</u> (1) conduct any research about ovens, (2) read or see any advertisements for ovens, or (3) receive any representations by Whirlpool about the quality of KitchenAid ovens generally or the quality of the Oven model that Ms. Cates ultimately bought. (*Id*. at 18:4-6, 32:9-18, 89:6–90:11, 104:17-21, 139:7-11, 140:11–141:21, 143:10-15.) Indeed, no in-store marketing or advertising impacted her decision. (*Id*. at 94:18-22, 95:3-7.)

Ms. Cates' Oven came with a one-year full written warranty that runs "from the date of purchase" and that covers "factory specified parts and repair labor costs to correct defects in materials or workmanship." (Haines Decl., Ex. 2.) This warranty disclaimed incidental and consequential damages, but it did not disclaim implied warranties. (*Id.*) Although Ms. Cates is "sure" that she could have asked to read the warranty prior to purchase, she did not do so because she "wasn't interested." (Cates Dep. at 139:12–140:10.)

Ms. Cates paid approximately $2000 for her Oven. (*Id*. at 98:14-19.) She does not think that she overpaid for it (*id*. at 101:10-15), and she understood she was purchasing the Oven from Queen City Appliances, not Whirlpool (*id*. at 103:18-25). Ms. Cates expects her Oven to last for "eternity" or for "as long as the home is in existence." (*Id*. at 195:4-6.)

Ms. Cates regularly used her Oven for nearly a decade without incident. (*Id*. at 11:22–12:2, 51:6-8.) During this time, Ms. Cates ran up to three self-clean cycles, with each cycle

cleaning her Oven without incident. (*Id*. at 116:19–117:7, 118:18-23, 185:3-22.) However, during the fourth time, Ms. Cates' oven "locked up" and shut down. (*Id*. at 112:17-24, 117:22-24, 114:7-11, 138:8–139:5, 230:3-5.)

After a third-party servicer replaced her Oven's TOD and thermal fuse, Whirlpool reimbursed Ms. Cates for the full cost of this repair even though the Oven's one-year written warranty had expired nine years earlier. (*Id*. at 160:2-10, 165:10-13, 166:21–167:4, 175:6–25, 250:6-13.) Ms. Cates cashed the check and continued to use her Oven. (*Id*. at 181:18-20, 278:7-20.) Six months later, she filed this class action against Whirlpool. (*Id*. at 181:1-9, 278:7-20.)

More than a year after Ms. Cates filed suit, Whirlpool's engineering expert, Dr. Taylor, and Plaintiffs' engineering expert, Mr. de Richemond, inspected and tested her Oven in her kitchen. (*See* Taylor Rep. ¶ 69.) During that inspection, the self-clean cycle was run twice and both cycles ended prematurely because the thermal fuse tripped. (*Id*. ¶¶ 72, 75-76.) Because the fan, door seals, and fuses were replaced between cycles, Dr. Taylor was able to rule out improper functioning of these parts as the cause of the tripping. (*Id*. ¶¶ 74, 80.) However, because manufacturing issues and non-visible age degradation issues were not evaluated (due to the difficulty and time necessary to disassemble, inspect, and test her Oven), neither expert could rule out these issues as the cause of the tripping. (*Id*. ¶ 80; de Richemond Dep. at 219:13-220-24.) Ms. Cates' Oven was repaired so she could keep using it.

### 2. Ms. Kljajic's IKEA Oven Broke After Two Days, and Whirlpool Went Beyond its Warranty Obligations by Providing a Free Replacement Oven

In 2013, Ms. Kljajic bought an IKEA-branded single Oven for a condominium she was remodeling in Chicago. (Dep. of Beth Kljajic ("Kljajic Dep.") 10:21–11:3, 13:22–14:3, 17:17-18, 22:4-8, Def.'s Subm. Ex. N.) Ms. Kljajic knew she was going to purchase an IKEA Oven before she even visited the IKEA store because she already had decided to build her entire

kitchen using just IKEA products. (*Id*. at 11:6-13, 17:13-16, 72:1-7.) Ms. Kljajic claimed that other factors influenced her purchase decision, including that the Oven was a built-in, had convection, had self-clean, was low cost, was stainless steel, was made by Whirlpool, matched her other IKEA kitchen appliances, and was the right size for her IKEA cabinets. (*Id*. at 13:9–14:2, 20:24–21:23.) Prior to buying her Oven, Ms. Kljajic did not (1) conduct any research about the Oven, (2) read or see or hear any advertisements about IKEA ovens, or (3) receive any representations by IKEA or Whirlpool about the quality of IKEA ovens generally or the quality of the model of IKEA Oven she ultimately purchased. (*Id*. at 20:18-23, 108:15-22, 112:9-14, 113:13-19; 116:1-25; 119:4-8; 119:20–121:6; 191:5-10.) In fact, the only in-store marketing or advertising that impacted Ms. Kljajic's purchase decision was a sign containing the name "Whirlpool" in large letters. (*Id*. at 107:8–108:8.)

Ms. Kljajic's Oven came with a five-year limited written warranty that runs "from the date of purchase" and that "factory specific parts and repair labor to correct defects in materials or workmanship that existed when the major appliance was purchased." (Haines Decl., Ex. 3.) This warranty disclaims both incidental and consequential damages and implied warranties. (*Id.*)

Ms. Kljajic paid approximately $800 for her Oven. (Sales Receipt, Def.'s Subm. Ex. O.) Ms. Kljajic does not think she overpaid for her Oven (Kljajic Dep. at 108:23-25), and she understood she was purchasing a Whirlpool-manufactured oven from IKEA, not from Whirlpool (*id*. at 21:2–3). Unlike Ms. Cates' expectation, Ms. Kljajic expects her Oven to last for 10 years with a few repairs needed during that period. (*Id*. at 146:21–147:18.)

Ms. Kljajic's Oven was installed into the IKEA cabinets several months after her purchase. (*Id*. at 69:19-21.) Two days after she moved in to her condominium, Ms. Kljajic ran

the self-clean cycle. (*Id*. at 76:14-25.) At some point during that cycle, the user interface showed an error message and the door remained locked at the end of the cycle. (*Id*. at 80:6-13.)

Whirlpool subsequently arranged for a third-party servicer to repair the Oven. (*Id*. at 85:5–86:2.) However, when the necessary replacement parts were delayed, Whirlpool decided to give Ms. Kljajic a new IKEA Oven—an act beyond its warranty obligation. (*Id*. at 87:11-17, 103:11-18, 180:9–181:1; Murray Decl. ¶ 19.) Unlike her original IKEA Oven, which had a (-0) engineering digit, the new Oven had a (-1) engineering digit, indicating that it had a reconfigured user interface layout, electronic control board, and thermal fuse intended to improve airflow around these components and increase their temperature margins in operation. (Ohlsson Decl. ¶¶ 83, 85; Taylor Rep. ¶ 92.) Ms. Kljajic accepted and used the new Oven. (Kljajic Dep. at 10:8-20, 141:17-22.) However, eight months later and without first expressing any dissatisfaction to Whirlpool about her new Oven, Ms. Kljajic filed this class action. (*Id*. at 200:18-20.)

The parties' experts inspected Ms. Kljajic's new oven in 2016. (Taylor Rep. ¶ 83.) During that inspection, the self-clean cycle was run twice, and both cycles ended prematurely as a result of the thermal fuse tripping. (*Id*. ¶¶ 85-90.) Dr. Taylor identified improper installation of the Oven in the IKEA-supplied cabinets and misplacement of insulation within the Oven as possible contributors to the tripping. (*Id*. ¶ 94.) However, due to the difficulty and time necessary to disassemble, inspect, and test her Oven further, neither expert could confirm or rule other any possible causes of the tripping. (*Id*.; de Richemond Dep. at 219:13-220:24.)  Ms. Kljajic's Oven was subsequently repaired so she could continue using it.

## IV.   WHIRLPOOL'S COMMITMENT TO CUSTOMER SATISFACTION

Although Plaintiffs cite to Whirlpool's customer contacts databases (*see* Mem. at 13, 29-31), they fail to acknowledge what that data shows—i.e., that Whirlpool regularly provides in- and out-of-warranty relief to the small subset of consumers who experienced a fuse trip while

using their Ovens' self-clean feature and contacted Whirlpool to remedy the issue. 

(Murray Decl. ¶¶ 9-11.) The Customer eXperience Center is dedicated to identifying each customer's individualized needs and finding the right resolution for that customer's circumstances. (*Id.* ¶¶ 7, 10.) The discretionary nature of this process is a reflection of the reality that what is satisfying to one customer might be different to another.

Indeed, Plaintiffs befitted from Whirlpool's commitment to customer service. Despite having no obligation to do so, Whirlpool reimbursed Ms. Cates for the cost of her Oven repair and provided a replacement Oven to Ms. Kljajic. (*See* Statement of Facts, Part III.B.1, *supra*.)

## ARGUMENT

Plaintiffs seek certification of five damages classes and two alternative injunctive classes, as well as alternative certification of an untold number of issues. (*See* Mem. at 9-10.) As discussed below, none of Plaintiffs' proposed classes can be certified, as each putative class member's claims must be evaluated based on his or her own evidence. Putative class members purchased Ovens that were built on 322 different base models with 63 materially-different designs and manufactured and sold at different times over the course of nearly two decades. They made their purchase decisions for different reasons after receiving different representations from Whirlpool (if any) or third parties. They received different warranties with terms that differ in material respects. They may not have experienced a trip, and if they did, that trip may have been caused by any number of reasons, many of which are completely out of Whirlpool's control. And they made no effort or different efforts to notify Whirlpool and received different remedies from Whirlpool. When these individual questions are piled upon the layers of

conflicting or undecided legal standards spanning 18 states, it is plain that the difficulties in trying this case as a class action are insurmountable.

The claims Plaintiffs assert differ by class and Ovens at issue, as shown below:

| Name | Multi-State Damages | Multi-State Damages | Illinois Damages | Illinois Damages | South Carolina Damages | Multi-State Injunction (alternative) | Multi-State Injunction (alternative) |
|---|---|---|---|---|---|---|---|
| Type | 23(b)(3) | 23(b)(3) | 23(b)(3) | 23(b)(3) | 23(b)(3) | 23(b)(2) | 23(b)(2) |
| States | 16 (not IL or S.C.) | 16 (not IL or S.C.) | Illinois | Illinois | S.C. | 16 (not IL or S.C.) | 16 (not IL or S.C.) |
| Brand | All Brands[14] | IKEA[15] | All Brands | IKEA | All Brands | All Brands | IKEA |
| Claim | Express Warranty | Express Warranty | Express Warranty; ICFA; Implied Warranty; Unjust Enrichment | Express Warranty; ICFA; Implied Warranty; Unjust Enrichment | Unjust Enrichment | Express Warranty | Express Warranty |
| Rep. | Kljajic | Kljajic | Kljajic | Kljajic | Cates | Kljajic, Cates | Kljajic, Cates |

# I. STANDARDS FOR RULE 23 CLASS CERTIFICATION

Rule 23 contains "stringent requirements" for certification, which in practice "exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013). To establish certification, Plaintiffs must affirmatively demonstrate their compliance with each Rule 23 prerequisite and do so with <u>evidentiary proof</u>. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Certification is not proper unless the district court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* (quoting *Wal-Mart Stores,*

---

[14] Plaintiffs seek certification of four classes of consumers who purchased "Whirlpool Ovens," but they fail to define which specific models or brands are included in these classes. (*See* Mem. at 9.) Whirlpool assumes that these classes include all KitchenAid-, Whirlpool-, and IKEA-brand ovens built on the Vision II platform from 1998 to the present.

[15] Plaintiffs fail to specify which models are in their three "Whirlpool Ovens sold by IKEA" classes. (*See* Mem. at 9-10.) Because IKEA only started selling IKEA-brand ovens built on the Vision II platform in May 2005, (*See* Ohlsson Decl., Tbl. 1), and has never sold KitchenAid- or Whirlpool-brand Ovens, Whirlpool assumes that Plaintiffs' "sold by IKEA" classes include only those IKEA-brand ovens built on the Vision II platform.

*Inc. v. Dukes*, 564 U.S. 338, 350-52 (2011)). "Mere *assertion* by class counsel that common issues predominate is not enough," as "[c]ertification would be virtually automatic." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Accordingly, the Rule 23 analysis may require a preliminary inquiry into the merits of Plaintiffs' claims, *see Comcast*, 133 S. Ct. at 1432, including the resolution of disputed evidence, *see Parko*, 739 F.3d at 1085.

Plaintiffs glaringly misstate the standard for class certification, claiming that "Rule 23 should be liberally interpreted in favor of the maintenance of class actions" and that "material doubts about the facts" should "generally be resolved in favor of certification." (Mem. at 11.) This standard cannot square with the Supreme Court's teachings that the class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Comcast*, 133 S. Ct. at 1432, and "actual, not presumed, conformance" with Rule 23 is "indispensable," *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). Indeed, the Seventh Circuit recently reversed class certification where the district court improperly "treated predominance as a pleading requirement" instead of "investig[ating] the realism of the plaintiffs' injury and damages model in light of the defendants' counterarguments." *Parko*, 739 F.3d at 1086-87.[16]

## II. PLAINTIFFS HAVE FAILED TO PROVE THE EXISTENCE OF ANY COMMON QUESTIONS, MUCH LESS THAT COMMON QUESTIONS PREDOMINATE OVER INDIVIDUAL ONES

To establish Rule 23(a)(2)'s commonality requirement, Plaintiffs must prove that their claims depend on a "common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is

---

[16] *See also Brown v. Electrolux Home Prods., Inc.,* 817 F.3d 1225, 1233-34 (11th Cir. 2016) (holding that "the district court misstated the law when it said that it 'resolves doubts related to class certification in favor of certifying the class'" because "the presumption is against class certification").

central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. In other words, Plaintiffs must show that "the same evidence will suffice for each member to make a prima facie showing [or that] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). While a single common question "will do," *Dukes*, 564 U.S. at 359, "superficial common questions" are not sufficient, *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012). Rather, "[w]hat matters to class certification . . . [is] the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (second alteration in original) (citation omitted).

Rule 23(b)(3) is "even more demanding," *Comcast*, 133 S. Ct. 1432, requiring a plaintiff to prove that the proposed class is "sufficiently cohesive to warrant adjudication by representation,'" *Tyson Foods*, 136 S. Ct. at 1045 (citation omitted). In other words, the plaintiff must prove that "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.*

Although Plaintiffs identify several superficially "common" questions and claim that those questions predominate (*see* Mem. at 14-15, 22-27), a rigorous analysis reveals that this case involves **only** individual questions and certainly does not present common issues that predominate over the myriad of individual ones. Plaintiffs fail to satisfy Rule 23(a)(2) and (b)(3).

### A.     Plaintiffs Cannot Prove the Existence of a Defect with Classwide Evidence

In order to satisfy commonality and predominance, Plaintiffs' Motion is necessarily premised on an alleged design defect that uniformly affects all Ovens. (*See* Mem. at 23-27.) They argue that the Ovens share an "inherent Defect"—i.e., "several design issues that combine to cause the Ovens to fail during self cleaning." (*Id.* at 3, 14-15.) According to Plaintiffs, the presence of the defect question is enough to merit class treatment because it is a "single, central,

common issue of liability." (*Id*. at 19 (quoting *Butler II*, 727 F.3d at 801-02).) Plaintiffs'

argument fails because (1) they offer no credible <u>evidence</u> showing that a uniform defect exists

across all Ovens; and (2) their reliance on the Seventh Circuit's *Butler* decisions is misplaced.

        1.    Plaintiffs Fail to Proffer Cognizable Evidence Showing a Uniform Defect

Plaintiffs rely almost exclusively on their experts' opinions as support for their uniform

design defect theory. (*See* Mem. at 3-4.) But Mr. de Richemond and Professor Singpurwalla

improperly claim that the mere fact that Plaintiffs' Ovens experienced fuse tripping during a self-

clean cycle is itself "evidence" of a classwide defect affecting all Ovens, wholly overlooking the

Ovens' many materially different designs and admitting that they do not know what caused the

failures of Plaintiffs' Ovens. (*See, e.g.*, de Richemond Dep. at 219:13-220-24; Singpurwalla

Dep. II at 90:14-19, 119:10-22.) Indeed, Mr. de Richemond admitted that "[t]here are many

factors that enter into causing this common failure and they could be different." (de Richemond

Dep. at 219:13-220:24.) Their opinions are unreliable and inadmissible under *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as detailed in Whirlpool's concurrently-filed

motions to exclude.[17] Without the testimony of their experts, Plaintiffs cannot meet their burden

of showing that the defect question is, in fact, common to the class. *See, e.g.*, *Mednick v. Precor,*

*Inc.*, Case No. 14 C 3624, 2016 WL 3213400, at *6-7 (N.D. Ill. June 10, 2016) (holding that the

plaintiffs could not prove that the defect question was common where the plaintiffs' expert's

opinions were inadmissible under *Daubert*).

---

[17] Because these opinions are central to Plaintiffs' theory of liability, this Court "must make a conclusive ruling on" Whirlpool's *Daubert* motion "before it may rule on [Plaintiffs'] motion for class certification." *Messner*, 669 F.3d at 812; *see Parko*, 739 F.3d at 1085 ("[W]hen factual disputes bear on issues vital to certification (that is, to whether the suit should be allowed to be litigated as a class action) . . . the court must receive evidence . . . and resolve the disputes before deciding whether to certify the case." (quotation marks omitted)).

Even if Plaintiffs' experts survive Whirlpool's *Daubert* challenge, their highly-abstract defect theory—i.e., that the Ovens have "design issues" that make them insufficiently "robust" (Mem. at 3-4; *see also* de Richemond Dep. at 200:15-18 ("[T]he common defect is that these ovens fail during a self clean and the cause of the failures are many."))—is not credible evidence of a uniform defective design. The mere fact that all 322 Oven models may "fail during self-cleaning" (Mem. at 3) is not enough to establish that all 322 models suffer from the same allegedly flawed design, nor that they failed (or are unduly prone to fail) in the same way because of that design, as opposed to the several non-design related causes of such failures. *See Mednick*, 2016 WL 3213400, at *7 (holding that plaintiffs failed to prove that the defect question was capable of classwide proof where they made the unsubstantiated "leap from the *existence* of [a condition] to the conclusion that *all* of the [machines at issue] are defective"); *Robinson v. Gen. Elec. Co.*, Case No. 09-cv-11912, 2016 WL 1464983, at *5 (E.D. Mich. Apr. 14, 2016) (denying certification where there was "no evidence that a single design flaw pertaining to safety mechanisms is common across all of the models" and emphasizing that "Plaintiffs' failure to identify a single part, system, or even TCO temperature, defeats commonality").

Moreover, to the extent that Plaintiffs rely on Whirlpool's Technical Service Pointers and IKEA's third-party testing as evidence of a uniform defect (*see* Mem. at 3-4), that effort fails. The fact that the Technical Service Pointers identify several different causes of tripping and provide repair solutions targeted at specific subgroups of Ovens, actually highlight the differences in designs among the Ovens models. (Ohlsson Decl. ¶¶ 60, 62, 64-66, 70, 76-77, 80, 84.) IKEA's third-party testing—███████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ (*Id.* ¶ 56.) Nor can Plaintiffs

rely on the fact that Ms. Kljajic's and Ms. Cates's Ovens both tripped during discovery in this case. (*See* Mem. at 5-6.) These <u>two</u> anecdotal reports do not suffice to raise an inference that the two million Ovens sold over the last 18 years are uniformly defective.[18] *See Dukes*, 564 U.S. at 358-59 (holding that anecdotal evidence was too weak to raise an inference of classwide discrimination).

In fact, all credible <u>evidence</u> shows that Plaintiffs cannot prove "in one stroke" that all 322 Oven models are defective. *Id.* at 349-50. Because the Ovens have at least 63 different designs that are materially relevant to tripping—a fact that Plaintiffs' experts do not dispute— determining whether a particular Oven contains a design defect will necessarily depend on individual proof as to that Oven's brand (KitchenAid, Whirlpool, IKEA), configuration (single, double, combination), width (24", 27", 30"), cooling fan, and thermal fuse configuration and set-point. These differences make it impossible for a jury to "make a once-and-for-all decision" about whether all 322 Ovens are defective. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1019 (7th Cir. 2002) (reversing class certification order because "it would not be possible to make a once-and-for-all decision about whether all 60 million tires were defective" where each of the six trade names at issue came in multiple versions with different tread designs, diameters, widths, safety features, and failure modes); *see also Mednick*, 2016 WL 3213400, at *7 (denying certification as the "determination" of whether the "machines suffer from common design defects . . . cannot be made for all members of the putative class in a single adjudication, but

---

[18] In fact, other anecdotal evidence shows that Oven owners have run self-cleaning cycles for many years without experiencing a single trip. For instance, Whirlpool's expert, Dr. Taylor, has owned a KitchenAid double Oven since 2002 and run 15 to 30 self-clean cycles without incident. (*See* Taylor Rep. ¶ 99 fig.30.) And pre-release UL 858 submissions, in which not a single tested Oven tripped, further undermines any inference that could be drawn from Plaintiffs' experiences during discovery. (Ohlsson Decl. ¶ 18.)

rather would require individualized inquiry into each user, each type of machine and each heart rate system at issue").

Moreover, even if a jury found that a certain model group contained a design defect, determining whether that defect actually <u>caused</u> a particular Oven to fail would depend on individual proof to rule out the many alternative causes of fuse tripping (e.g., improper installation) for which Whirlpool could not be held liable. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 603-04 (3d Cir. 2012) (holding that the plaintiff could not show "without resort to individual proofs, that [the alleged] defect caused the class members' damages" because a "tire can 'go flat' for myriad reasons" and "[e]ven 'defective' tires can go flat for reasons completely unrelated to their defects"); *see also Maloney v. Microsoft Corp.*, Civ. No. 09-2047, 2012 WL 715856, at *2-5 (D.N.J. Mar. 5, 2012) (denying certification where plaintiffs alleged that the defect could "result from a muddled mix of causes and effects" but failed to put forth any evidence to establish a unifying theory of causation capable of class-wide proof).

2.     Plaintiffs' Reliance on the *Butler* Decisions Is Misplaced

Plaintiffs devote a substantial portion of their brief to arguing that certification is proper under the Seventh Circuit's *Butler* decisions. (*See* Mem. at 13, 20-21, 23-24, 33.) According to Plaintiffs, *Butler* holds that predominance is satisfied anytime "[t]here is a single, central, common issue of liability: whether the . . . machine was defective." (Mem. at 19-20 (quoting *Butler II*, 727 F.3d at 801-02).) But that is a deeply flawed reading that would "reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast*, 133 S. Ct. at 1433 (rejecting notion that "at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be"). Not only does *Butler* not stand for such a broad proposition, but it is inapposite.

23

Unlike here, the *Butler* plaintiffs set forth evidence showing a specific design defect that thread through all of the class models regardless of design change—i.e., the use of less water than traditional top-loading washers, which resulted in the front-loaders failing to clean their interior components of soil and residue deposits, which in turn caused mold and bacteria growth. *See Butler II*, 727 F.3d at 798-802 (emphasizing that predominance must "be satisfied by proof presented at the class certification stage rather than deferred to later stages in the litigation"); *see also Glazer v. Whirlpool Corp.*, 722 F.3d 838, 847, 855, 859 (6th Cir. 2013) (in companion case to *Butler*, affirming certification where plaintiffs set forth evidence showing specific design characteristics that were common across all models).

Here, by contrast, Plaintiffs have not identified the glue than can hold together all 322 Oven models. Plaintiffs suggest that they have because all Ovens "are prone to failure during the self-cleaning cycle" (Mem. at 14)—an assertion that is undermined by all available data (*see* Statement of Facts, Part II.A., *supra*)—but their expert concedes that "many factors" can cause that failure and he does not know what caused Plaintiffs' failures (de Richemond Dep. at 219:13-220:24). *Butler* does not stand for the proposition that the mere existence of a common effect is enough to meet Rule 23(b)(3).

Moreover, since his *Butler* opinions, Judge Posner has emphasized that plaintiffs must offer evidence establishing that the suit should proceed as a class action. *See Parko*, 739 F.3d at 1085, 1087. In *Parko*, the Seventh Circuit reversed class certification where the district court erroneously concluded that the plaintiffs' unsubstantiated claims were sufficient to satisfy Rule 23(b)(3). As Judge Posner explained, "[m]ere *assertion* by class counsel that common issues predominate is not enough. That would be too facile. Certification would be virtually automatic." *Id.* at 1085 (quoting *Dukes*, 564 U.S. at 350). It is telling that Plaintiffs do not acknowledge

*Parko* and, instead, attempt to stretch *Butler* beyond its rational limits by suggesting that *Butler* supports certification of ***any*** case where the plaintiffs simply allege the presence of a "common defect." That is not the law.

Finally, the manageability concerns in *Butler* were of a much smaller magnitude than they are in this case. *Butler* involved certification of two liability-only classes for breach of express warranty claims on behalf of purchasers in six states. *See Butler II*, 727 F.3d at 797-800. With respect to the "mold claims," the washers covered "only five design changes that relate to mold." *Butler I*, 702 F.3d at 361. Design changes were not an issue in the "control-unit" class. *Butler II*, 727 F.3d at 799. Here, by contrast, this case involves (1) certification of seven proposed classes and certification of an untold number of issues, (2) four distinct claims, (3) Ovens that have at least 63 materially-different designs related to the alleged defect, and (4) a total of 18 states' laws across all classes and claims. Plaintiffs' heavy reliance on *Butler* is, thus, unavailing.

### B. Plaintiffs Cannot Prove the Elements of Their Claims with Classwide Proof

Plaintiffs identify several additional "common" questions of law and fact that they claim predominate over individual questions. (*See* Mem. at 14-15, 24-27.) However, Plaintiffs make no meaningful attempt to explain how their supposed "common" questions are, in fact, capable of classwide resolution or how they will resolve issues central to the validity of their claims. In fact, a proper analysis of Plaintiffs' claims reveals that this lawsuit involves ***only*** individual questions and certainly does not present common questions that predominate.[19] *See Erica P. John Fund,*

---

[19] Individualized questions flow from not only the elements of each claim (*see* Argument, Part II.B., *infra*) but also Whirlpool's defenses to each claim. For example, Whirlpool will have strong statute-of-limitations defenses because all of the proposed classes include individuals who purchased their Ovens as early as 1998 (*see* Mem. at 29), but Plaintiffs did not file this action until 2015. Determining whether a particular Oven owner's claims are time-barred will require individualized inquiries to identify the date that the applicable statute of limitations accrued. (*See* Def.'s App. of Relevant Statutes of Limitation.)

*Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action.").

1.      Express Warranty Claims (Multi-State, Illinois Classes)

Ms. Kljajic asserts express-warranty claims on behalf of the Multi-State and Illinois Classes under both the Magnuson-Moss Federal Warranty Act ("MMWA") and the laws of 17 states.[20] (*See* Def.'s App. of State Warranty-Law Variations.) Although there are differences among the 17 states as to the proof necessary to succeed on a claim for breach of express warranty, each state generally requires proof of the following: (1) the terms of the warranty; (2) the defendant's breach of that warranty; (3) that the plaintiff gave the defendant notice of the breach; and (4) damages caused by the breach. (*See id.*) None of these elements are common.

First, although the written warranties that accompanied the Ovens contain some overlapping terms—e.g., each limits Whirlpool's obligation to repair and replacement of specified parts, provides that the warranty is the customer's sole remedy, and excludes problems due to product misinstallation—the warranties at issue differ in three critical respects. (*See* Murray Decl. ¶ 21.) Specifically, there are differences among the warranties in scope (full vs. limited), in duration (1 year vs. 5 year), and in disclaimers (some contain a disclaimer of incidental or consequential damages; others do not). (*Id.* ¶¶ 21-22; Haines Decl. ¶15, Exs. 1-8.) While Plaintiffs' gloss over these differences (*see* Mem. at 7-8), they cannot even prove the first

---

[20] Because Plaintiffs do not allege that Whirlpool breached any of the additional obligations imposed by the MMWA, *see* 15 U.S.C. §§ 2303(a), 2304, their MMWA claim is coextensive with their express warranty claims under state law. *See Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 291 (4th Cir. 1989). Moreover, although Plaintiffs have individually asserted express-warranty claims based on alleged affirmations of fact (Second Am. Compl. ¶¶ 111-20), the express-warranty claims advanced in the Motion are solely based on the written warranties that accompanied the Ovens (*see* Mem. at 3-4, 22-23).

element of an express-warranty claim (the terms of the warranty) without an individualized showing.

Second, Plaintiffs do not, because they cannot, show that they can prove that Whirlpool breached its warranty obligations with common evidence. Whether Whirlpool breached a given warranty is a highly-individual inquiry that depends on whether the Oven experienced a trip, whether that trip was caused by a defect in material or workmanship, whether that trip was caused by improper installation,[21] whether that trip occurred within the terms of the written warranty, and whether Whirlpool subsequently repaired or replaced the defective components in accordance with the warranty's terms.[22] Indeed, even if Plaintiffs could prove a uniform design defect (they cannot), that proof would not establish that Whirlpool breached its warranty obligations as to a single class member. Accordingly, the breach element is not susceptible to classwide treatment and, instead, predominates over any other common questions. *See, e.g.*, *Castro Valley Union 76, Inc. v. Vapor Sys. Techs., Inc.*, No. C 11-0299 PJH, 2012 WL 5199458, at *13-14 (N.D. Cal. Oct. 22, 2012) (noting that express warranty claims are "not suitable for class treatment [where] it depends on the particular circumstances of individual class members").

Third, as many as 16 of the states require some form of proof that the buyer notified the seller of an alleged malfunction within a reasonable time and gave the seller an opportunity to cure.[23] (*See* Def.'s App. of State Warranty-Law Variations, Issue V.) This is a highly-

---

[21] All of the warranties expressly exclude problems arising from improper installation. The individualized nature of this inquiry is illustrated by Plaintiffs' own experiences. Whirlpool's in-home inspections revealed that Ms. Kljajic's IKEA Oven was installed contrary to both Whirlpool's and IKEA installation instructions. (*See* Taylor Rep. ¶¶ 83, 94; Ohlsson Decl. ¶¶ 79-80.)

[22] Plaintiffs falsely claim that whether "Whirlpool failed to repair the Defect" is a common question. (Mem. at 24.) Whether Whirlpool was able to repair or replace a malfunctioning Oven is, in fact, highly individualized. (*See* Statement of Facts, Part II.D, *supra* (showing that the majority of Ovens with a trip are successfully repaired on the first attempt).)

[23] The applicable laws vary substantially, including within state, regarding whether notice is required and

individualized inquiry that precludes certification.[24] *See, e.g.*, *Haley v. Kolbe & Kolbe Millwork Co.*, 14-cv-99-bbc, 2015 WL 9255571, at *13 (W.D. Wis. Dec. 18, 2015) (denying certification because "individual fact-specific inquiries would be necessary with respect to the timing, content and recipient of each class member's notice"); *Martin v. Ford Motor Co.,* 292 F.R.D. 252, 272 n. 22 (E.D. Pa. 2013) (denying certification and noting that "pre-litigation notice" is one element "that often preclude[s] certification of multi-state breach of express warranty classes").

Fourth, Plaintiffs must prove damages as a result of the alleged breach. Because Plaintiffs have offered no damages model demonstrating that damages are susceptible to classwide proof (*see* Argument, Part III, *infra*), individual proof of damages will be required.[25] Indeed, the warranties all provide that repair and replacement is the sole remedy available, which necessarily would require proof of a malfunction and the cost to repair or replace the malfunctioning Oven. (*See, e.g.*, Haines Decl., Exs. 1-9.)

Finally, certain putative class members' express-warranty claims would require additional individualized proofs because their states require proof of reliance on the written warranty[26] or privity of contract.[27] For instance, as Plaintiffs concede, Illinois generally requires

---

what constitutes proper notice. (*See* Def.'s App. of State Warranty-Law Variations, Issue V.)

[24] Plaintiffs essentially concede this point, but then seek to avoid the problem by incorrectly claiming that none of the states require proof of notice. (Mem. Ex. 1.) Plaintiffs misconstrue or misstate the law, as shown in Defendant's Appendix of State Warranty-Law Variations.

[25] And although the warranties uniformly provide that repair and replacement is the sole remedy available under the warranty, Plaintiffs likely will argue that these damages limitations are unenforceable because the warranty failed its essential purpose. (*See* Mem. at 24-25.) But whether the warranty failed its essential purpose raises a slew of additional individualized issues.

[26] At least Colorado, Maryland, Nebraska, New York, and North Carolina require proof that the plaintiff was aware of the warranty and relied on it in deciding to buy their Ovens. (*See* Def.'s App. of State Warranty-Law Variations, Issue III.) This inquiry will be individualized, as confirmed by named Plaintiffs themselves who admitted that they never read or cared about the warranty before purchase. (*See* Statement of Facts, Part III.B.1, *supra*.)

[27] Illinois, Indiana, Kansas, and Maryland require the plaintiff to be in privity with the defendant. (*See* Def.'s App. of State Warranty-Law Variations, Issue IV.) In those states, the vast majority of buyers

privity of contract. (Mem. at 25 n.13 (citing *Mednick v. Bayer*, Case No. 14 C 3624, 2014 WL 6474915, at \*5 (N.D. Ill. Nov. 13, 2014)).) While Plaintiffs claim that an exception exists for express-warranty claims based on "representations or promises made on the manufacturer's documents" (*id*.), Plaintiffs ignore that this exception applies only where the buyer <u>relied</u> on those representations. *See Mednick*, 2014 WL 6474915, at \*5; *Canadian Pac. Ry. Co. v. Williams-Hayward Protective Coatings, Inc.*, No. 02 C 8800, 2005 WL 782698, at \*15-16 (N.D. Ill. Apr. 6, 2005) (St. Eve, J.) (concluding that exception is inapplicable where the buyer fails to establish that the documents "were part of the basis of the bargain"). Proof of reliance is a highly-individualized inquiry that is not susceptible to class treatment. *See In re Yasmin & Yaz (Drospirenone) Mktg. Sales Prac. & Relevant Prods. Liab. Litig.*, 275 F.R.D. 270, 277 (S.D. Ill. 2011) (denying certification of warranty claim, *inter alia*, where proof of reliance will "turn on facts unique to each plaintiff").

### 2. Implied Warranty Claims (Illinois Classes)

Ms. Kljajic asserts a claim for breach of implied warranty on behalf of the Illinois Classes. (*See* Mem. at 9.) An implied-warranty claim requires proof that (1) the defendant sold goods that were not merchantable at the time of sale, (2) the plaintiff gave the defendant notice of the defect, and (3) the plaintiff suffered damages as a result of the defective goods. *See Baldwin v. Star Sci., Inc.*, 78 F. Supp. 3d 724, 741 (N.D. Ill. 2015). A plaintiff must also prove privity of contract with the manufacturer. *Reid v. Unilever U.S., Inc.,* 964 F. Supp. 2d 893, 910 (N.D. Ill. 2013). Each of these elements raise individual questions requiring class members to present evidence that varies from person to person.

---

could not assert an express-warranty claim against Whirlpool because they bought their Ovens from third-party retailers.

First, whether the Oven is "merchantable" is highly individualized given that the vast majority of Ovens have not experienced fuse tripping and, instead, have run self-clean cycles without incident for up to 18 years. While Illinois law might not require proof that the defect manifested itself,[28] it does require proof of diminished value in the event of an unmanifested defect—evidence that Plaintiffs do not submit here and which would be highly individualized. *See In re: Gen. Motors Type III Door Latch Litig.*, Nos. 98 C 5836, MDL 1266, 2001 WL 103434, at *3 (N.D. Ill. Jan. 31, 2001). Moreover, because a plaintiff must prove "the absence of abnormal use or reasonable secondary causes" to make a *prima facie* case that a product was not merchantable, *Alvarez v. Am. Isuzu Motors*, 749 N.E.2d 16, 23 (Ill. App. Ct. 2001), individualized inquiries will be required to determine that a particular owner installed and used his or her Oven pursuant to Whirlpool's instructions and to determine that the owner can rule out all non-design related alternative causes for tripping.

Still further, because the merchantability question turns on whether the product "failed to perform in the manner <u>reasonably to be expected</u> in light of [its] nature and intended function," *id.* (emphasis added) (quotation marks omitted), this Court will have to conduct individual inquiries to first ascertain each owner's subjective expectations for the self-clean feature and then determine whether the feature failed to perform consistent with those subjective expectations.[29] ████████████████████████████████████████████,[30] as well as Plaintiffs' divergent expectations, illustrate the individualized nature of this inquiry. *See generally Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9:11-cv-81373-DMM, 2013 WL 139913,

---

[28] *Compare Schiffner v. Motorola, Inc.*, 697 N.E.2d 868, 874-76 (Ill. App. Ct. 1998), *with Verb v. Motorola, Inc.*, 672 N.E.2d 1287, 1295 (Ill. App. Ct. 1996).

[29] Plaintiffs have not attempted to offer any classwide evidence of shared consumer expectations regarding the manner in which a self-clean feature is reasonably expected to perform and for how long.

[30] Decl. of Valerio Hammes ¶ 20, Def.'s Subm. Ex. P.

at *10 (S.D. Fla. Jan. 10, 2013) ("[T]he need to examine the state of mind of each borrower, including awareness, expectations, and conduct requires individualized scrutiny incompatible with class treatment.").

Second, notice will likely be highly individualized. While Illinois does not require direct notice when the seller has "actual knowledge of the defect of the particular product," this exception applies only where the "manufacturer is somehow apprised of the trouble with the particular product purchased by a particular buyer." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 589-90 (Ill. 1996) (holding that a manufacturer's "generalized information concerning [a] product line" from "various third parties" was insufficient); *accord Bietsch v. Sergeant's Pet Care Prods., Inc.*, No. 15 C 5432, 2016 WL 1011512, at *6 (N.D. Ill. Mar. 15, 2016) (cited by Plaintiffs (Mem. at 25 n.13)).[31] Because Plaintiffs do not set forth evidence showing that Whirlpool knew of problems in all models at issue, whether Whirlpool had actual knowledge of problems experienced by particular class members is highly individualized.

Finally, as explained above, proof of damages, causation, and privity will be necessary, which cannot be satisfied with common evidence. (Argument, Part II.B.1, *supra*.)

3. Unjust Enrichment Claims (Illinois, South Carolina Classes)

Ms. Kljajic and Ms. Cates assert unjust enrichment claims on behalf of the Illinois and South Carolina classes, respectively. (*See* Mem. at 9.) Under Illinois law, a plaintiff must prove that (1) "the defendant has unjustly retained a benefit to the plaintiff's detriment," and (2) "defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). South Carolina

---

[31] Several federal district courts have refused to dismiss where the plaintiffs alleged that the manufacturer had actual knowledge of the defect at issue. (*See* Def.'s App. of State Warranty-Law Variations, Issue V.) Because Plaintiffs have submitted no evidence showing Whirlpool knew that all Oven models suffered from their claimed defect, those cases are inapplicable and notice remains an individualized issue.

requires proof of (1) a benefit conferred by the plaintiff upon the defendant, (2) realization of that benefit by the defendant, and (3) retention of the benefit "under circumstances that make it inequitable for him to retain it without paying its value." *Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.*, 684 S.E.2d 756, 764 (S.C. 2009).

These elements are not susceptible to classwide proof because what is unjust and what violates principles of equity are necessarily individualized inquires. *See Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 500-01 (S.D. Ill. 1999) ("[T]he defendants' liability for unjust enrichment to a particular plaintiff depends on the factual circumstances of the particular purchase at issue. This individual inquiry presents more than a simple question of whether a particular plaintiff can prove damages. Rather, it bears directly on the question of the defendants' liability for unjust enrichment to a particular plaintiff."). For example, to determine whether Whirlpool unjustly retained a benefit to the buyer's detriment, the Court will need to inquire into whether each buyer's Oven had a trip and whether that trip was caused by the alleged defect or by a cause for which Whirlpool is not responsible. Similarly, to determine whether Whirlpool's retention of that benefit violates principles of equity, the Court will need to inquire into what Whirlpool did to assist a particular owner and how much value that owner got out of the Oven before it experienced a trip.

Indeed, the named Plaintiffs' divergent experiences demonstrate the necessity of individualized proof in this context. Ms. Cates used her Oven for ten years, including running the self-clean cycle on two or three occasions without problem, before it first broke down, and Whirlpool reimbursed her for the repair costs. (*See* Statement of Facts, Part III.B.1, *supra*.) Ms. Kljajic used her Oven for two days before it malfunctioned, but Whirlpool gave her a new Oven. (*See* Statement of Facts, Part III.B.2, *supra*.) Under these circumstances, a jury could

reasonably find that neither Plaintiff, both Plaintiffs, or one Plaintiff has proven their claim. The inability to answer the questions of equity "in one stroke" precludes certification. *See Dukes*, 564 U.S. at 349-50.

                    4.        Consumer Fraud Claims (Illinois Classes)

Ms. Kljajic asserts a claim for violation of the Illinois Consumer Fraud Act ("ICFA") on behalf of the Illinois Classes. (*See* Mem. at 9.) To succeed on an ICFA claim, a plaintiff must prove (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damages proximately caused by the deception. *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E. 2d 910, 926 (Ill. 2007). The critical first and fourth elements of this claim require evidence that varies from member to member.

With respect to the first element, Plaintiffs seem to claim that Whirlpool violated the ICFA by (1) affirmatively misrepresenting that the self-clean feature would work by simply including self-clean "buttons" on the Ovens,[32] and (2) failing to disclose "the defect" at the point of sale. (Mem. at 15, 23-25.) Proof of these allegedly deceptive acts will require highly individualized inquiries because both are premised on the existence of a design defect, which itself requires individual proof. (*See* Argument, Part II.B.4, *supra*.)

---

[32] The "button" differed by model and name (some are labeled as "Clean," while others are "Self-Clean"), as shown in the following diagrams of Ms. Cates's and Ms. Kljajic's Oven's user interfaces:



Even assuming that the "CLEAN" or "SELF-CLEAN" "button" can conceivably be deemed an actionable representation (it cannot),[33] individualized inquires would still be required because Plaintiffs have not offered any classwide proof showing that all members of the class understood the button to be an assurance that the self-clean feature would never malfunction or require repair. *See, e.g., Thorogood v. Sears, Roebuck & Co.,* 547 F.3d 742, 747-48 (7th Cir. 2008) (concluding there were no common issues of law because there did not appear to be a single understanding of the significance of labeling or advertising of the allegedly deceptive statements). Moreover, whether the button is a <u>mis</u>representation is individualized because it would require proof that a given Oven failed to self-clean.

Individualized inquiries would similarly be required with respect to Whirlpool's alleged omissions. Because omissions-based ICFA claims require proof that a defendant possessed "prior knowledge of the information that they are alleged to have suppressed," *Reid*, 964 F. Supp. 2d at 915 (quoting *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 14 (Ill. App. Ct. 2001)), this Court would have to conduct individualized inquires to determine what Whirlpool knew about the likelihood of fuse tripping in a particular owner's brand and model <u>prior to</u> that owner's purchase. While Plaintiffs claim that the mere existence of Technical Service Pointers show that Whirlpool "was aware of the defect in the Ovens since at least 2000" (Mem. at 6), this argument fails. The bulletins (1) address a variety of unique manufacturing, supplier, installation, and environmental issues that arose at different times over the past two decades, and (2) offer targeted solutions only applicable to certain Oven designs. (*See* Statement of Facts, Part II.C.,

---

[33] Plaintiffs cite only *Carriuollo v. General Motors Co.*, 823 F.3d 977 (11th Cir. 2016), for the proposition that the self-clean button "is a misrepresentation prohibited by ICFA." (Mem. at 15.) But *Carriuollo* involved the "Monroney" window stickers that appear on new vehicles as required by federal law and which inform customers of the vehicle's NHTSA ratings for six safety categories. 823 F.3d at 981. Unlike a button that merely says "self-clean," the "Monroney" label actually provides objective data.

*supra*.) Far from showing that Whirlpool had knowledge of a uniform design defect since 2000, the service pointers demonstrate that Whirlpool knew different things about different subsets of Ovens at different points in time. (*See* Ohlsson Decl. ¶¶ 60, 62, 64-66, 70, 76-77, 80, 84.)

With respect to the fourth element, still more individualized inquiries would be required to determine whether a particular class member could prove they suffered actual damages proximately caused by Whirlpool's allegedly deceptive acts. Under the ICFA, a plaintiff must demonstrate proximate causation in the sense that she actually was "deceived by a statement or omission that is made by the defendant." *De Bouse v. Bayer AG*, 922 N.E.2d 309, 316 (Ill. 2009); *see also id*. ("[I]n a consumer fraud action, the plaintiff must actually be deceived by a statement or omission. If there has been no communication with the plaintiff, there have been no statements and no omissions. In such a situation, a plaintiff cannot prove proximate cause."); *Barbara's Sales*, 879 N.E.2d at 928 (a plaintiff bringing a class action "must prove that each and every consumer who seeks redress actually saw and was deceived by the statements in question"). Because exposure to the allegedly deceptive statement or omission must occur "prior to their dates of purchase," *Connick*, 675 N.E.2d at 594, this Court will have to conduct individualized inquiries to determine what allegedly deceptive statements were made to a particular class member and when. And if a particular class member was exposed to a pre-purchase deceptive statement, further individualized inquiries would be required to determine whether that allegedly deceptive statement "caused him or her to make that purchase."[34] *See, e.g.*, *Siegel*, 612 F.3d at 936 (affirming denial of certification on ICFA claim where plaintiff failed to establish that class members all purchased the gasoline at issue for the same reasons).

---

[34] Ms. Kljajic's testimony demonstrates this individualized inquiry: she purchased her IKEA Oven for a variety of reasons unrelated to its self-clean feature. (*See* Statement of Facts, Part III.B.2, *supra*.)

Finally, because Plaintiffs have offered no model demonstrating that damages are susceptible to classwide proof (*see* Argument, Part III, *infra*), still more individualized inquiries will be required.

### III. PLAINTIFFS CANNOT SATISFY RULE 23(B)(3) FOR THE ADDITIONAL REASONS THAT THEY HAVE NOT PUT FORWARD A CLASSWIDE DAMAGES MODEL, INDIVIDUAL QUESTIONS OF LAW PREDOMINATE, AND CLASS TREATMENT IS NOT A SUPERIOR METHOD

#### A. Plaintiffs Have Not Put Forward a Damages Model Showing that Damages Can Be Measured on a Classwide Basis

To obtain certification, Plaintiffs must proffer a sound model that measures "only those damages attributable" to Plaintiffs' theory of liability. *Comcast*, 133 S. Ct. at 1433 (a damages model that does not attempt to measure only those damages attributable to the theory of liability "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)"). A court determining whether to certify a Rule 23(b)(3) class "should begin with a 'rigorous analysis' into whether the plaintiffs' 'damages are susceptible of measurement across the entire class.'" *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014) (quoting *Comcast*, 133 S. Ct. at 1433). Only if damages can be calculated with common evidence should the court "examine the [other] matters identified in Rule 23(b)(3)." *Id.*

Despite this, Plaintiffs have not proposed *any* damages model. Indeed, it is not even clear what Plaintiffs' theory of harm is, much less whether that theory can be translated to damages. Specifically, Plaintiffs offer no expert testimony or other evidence to establish that "damages are susceptible of measurement across the entire class." *Id.* (quoting *Comcast*, 133 S. Ct. at 1433); *see also Doyle v. Chrysler Grp., LLC*, No. 15-55107, ___ F. App'x ___ 2016 WL 6156062, at *1-2 (9th Cir. Oct. 24, 2016) (reversing certification where plaintiff offered no model for determining classwide damages; absent such a model, there was "no way to determine whether

the proposed damages model measures damages that are solely attributable to the theory of liability").

While Plaintiffs note that "paying more for a product than its value with a defect constitutes a cognizable financial injury" and that "diminished value of the Oven" is a common question (Mem. at 13, 25), Plaintiffs do not, in fact, set forth any <u>evidence</u> showing that, due to the alleged defect, buyers uniformly paid too much or that the Ovens uniformly lost value. Nor is such evidence available on this record given that (1) Plaintiffs both testified that they did <u>not</u> overpay for their Ovens (Statement of Facts Part III.B.1-2, *supra*); (2) ███████████████████ ███████████████████████████████[35] (*see* Hammes Decl. ¶ 20); and (3) the vast majority of Ovens never experienced a trip and, instead, ran self-clean cycles without incident (Ohlsson Decl. ¶ 59; Murray Decl. ¶ 20).[36]

Absent a classwide damages model, a jury would have to conduct highly individualized inquiries to determine if a putative class member was harmed by the alleged defect and, if so, the amount of compensation due. For instance, Plaintiffs would have to prove for each putative class member that (1) she used the self-clean feature; (2) the Oven experienced a trip; (3) the trip was caused by the defect; (4) Whirlpool did not repair or replace the Oven under its warranty obligations or as part of its general commitment to customer service; and (5) how that translates into damages. Such a highly individualized inquiry defeats any efficiencies gained by class treatment.

---

[35] A putative class member who never ran the self-clean cycle cannot be deemed damaged by a supposed inherent design defect.

[36] As Plaintiffs' admit (*See* Mem. at 13), Rule 23 requires "the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349-50 (quoting *Falcon*, 457 U.S. at 157). Plaintiffs offer no <u>evidence</u> showing that those putative class members whose Ovens never failed suffered any injury at all, much less one that is the same as that suffered by Plaintiffs and those putative class members whose Ovens experienced a trip. Similarly, Plaintiffs have not articulated how consumers who do not use the self-clean function have been harmed.

Whirlpool anticipates that Plaintiffs will merely invoke the general rule that individual damages calculations do not preclude class certification. (*See* Mem. at 20 (citing *Butler* for that proposition).) But Plaintiffs improperly conflate the "fact of damage" (i.e., "injury")—a required element to each of their claims—with the calculation of the amount of damages traceable to that injury. *See Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 305-06 (3d Cir. 2016). "While obstacles to calculating damages may not preclude class certification, the putative class must first demonstrate economic loss—that is, the fact of damage—on a common basis." *Id.* at 306 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 189 (3d Cir. 2001)). Plaintiffs' failure to do so is fatal to their attempt at certification under Rule 23(b)(3).[37] *See, e.g.*, *Vazquez v. Ferrara Candy Co.*, No. 14 C 4233, 2016 WL 4417071, at *11 (N.D. Ill. Aug. 19, 2016) (denying certification where plaintiffs "failed to put forward any methodology or argument as to how the putative class will go about 'establishing that damages are capable of measurement on a classwide basis'"); *Langendorf v. Skinnygirl Cocktails, LLC*, 306 F.R.D. 574, 583-84 (N.D. Ill. 2014) (denying certification because the plaintiffs proposed no "suitable methodology" for establishing injury or damages on a classwide basis); *Dailey v. Groupon, Inc.*, No. 11 C 05685, 2014 WL 4379232, *9-10 (N.D. Ill. Aug. 27, 2014) (same).

### B. Plaintiffs Ignore Key Differences in the 16 States' Laws, Which Cause Individual Issues of Law to Overwhelm Any Common Issues

Plaintiffs assert four multi-state classes on behalf of purchasers in 16 different states. (*See* Mem. at 9-10.) "It is well-established under Seventh Circuit case law . . . that if the states' laws differ, class certification is improper." *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 583 (N.D. Ill.

---

[37] *Butler* does not mandate a different outcome. Unlike here, *Butler* involved certification of a liability-only class, which was "fundamental" to the Seventh Circuit's holding. *See Butler II*, 727 F.3d at 800. Moreover, the Seventh Circuit explained that "the fact that damages are not identical across all class members should not preclude class certification" "[i]f the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined." *Id.* at 801 (emphasis added). Plaintiffs fail to "genuinely" present common issues or show that damages could be "readily determined."

2009) (St. Eve, J.), *aff'd*, 612 F.3d 932 (7th Cir. 2010); *see also Bridgestone/Firestone*, 288 F.3d at 1015 ("No class action is proper unless all litigants are governed by the same legal rules."). Thus, Plaintiffs cannot satisfy their burden under Rule 23 if the Multi-State Classes' express-warranty claims would require application of conflicting state laws. *See Cunningham Charter Corp. v. Learjet, Inc.*, 258 F.R.D. 320, 3323 (S.D. Ill. 2009) ("The burden of proof on the requirement that choice of law and conflict of law issues not present any predominance or manageability issues rests squarely with the plaintiff.").

Plaintiffs assert that their Multi-State Classes would not present predominance or manageability concerns because the 16 states' laws are "materially the same." (Mem. at 9-10.) Plaintiffs are wrong. Although they purport to summarize the relevant states' laws (*see* Mem. Ex. 1), their summary is both incomplete and misleading.[38] In fact, a rigorous analysis reveals that those states conflict in several material respects, including as to whether (and how) a buyer must prove reliance, whether privity is required, whether a "materials and workmanship" warranty applies to a design defect,[39] whether a manifested "defect" is required to prove injury, and whether (and how) a buyer must prove notice, as shown in the chart below and detailed in Defendant's Appendix of State Warranty-Law Variations.

---

[38] Plaintiffs' Exhibit 1 is incomplete because it fails to ask material questions (e.g., it does not ask whether a "materials and workmanship" warranty covers a design defect). The exhibit is misleading because it often reflects superficial readings or mischaracterizations of case holdings. For a more detailed critique of Plaintiff's Exhibit 1, *see* Defendant's Appendix of State Warranty-Law Variations.

[39] Plaintiffs imply that the "materials and workmanship" warranties cover the "design defect." (*See* Mem. at 14-15.) But courts in at least six of the states have rejected the notion that a "materials and workmanship" warranty covers design defects. This Court would have to predict how the other 10 states would rule on this issue or merely assume that all 10 states would rule the same way. Doing so would offend bedrock principles of federalism. *See In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300-01 (7th Cir. 1995).

| State | Reliance Required? | Privity Required? | M&W Warranty Cover Design Defect? ** | Manifestation of Defect Required? ** | Claim-Specific Pre-Suit Notice Required? |
|-------|-----|-----|-----|-----|-----|
| Colorado | Yes* | No | Undecided | Undecided | Yes* |
| D.C. | Unclear* | Unclear* | Undecided | Yes | Unclear* |
| Indiana | Yes, to prove privity | Yes* | No | Yes | Yes* |
| Kansas | No | Yes* | Undecided | Undecided | No |
| Maryland | Yes* | Yes* | No | Undecided | Unclear* |
| Missouri | No | No | Undecided | Yes | Yes* |
| Nebraska | Yes* | No | Undecided | Undecided | Undecided* |
| N.H. | Presumed* | No | No | Yes | Undecided* |
| N.J. | No | No | No | Yes | Yes* |
| New York | Yes* | No | No | Yes | Undecided* |
| N.C. | Yes* | No | Undecided | Yes | Undecided* |
| PA. | No | No | No | Yes | Unclear* |
| Vermont | No | No | Undecided | Undecided | Yes* |
| Virginia | No | No | Undecided | Undecided | Yes* |
| W.V. | Presumed* | No | Undecided | Yes | Undecided* |
| Wisconsin | No | No | Undecided | Undecided | Yes* |
| (*) Denotes Disagreement with Plaintiffs' Characterization (**) Denotes Material Question Plaintiffs Did Not Analyze | | | | | |

These extensive inter-state conflicts reveal that individual issues of law overwhelm common issues and would make any class trial of the Multi-State Classes unmanageable.[40] *See Siegel*, 256 F.R.D. at 583-86 (denying certification of multi-state class because, notwithstanding plaintiff's representations to the contrary, it was clear that the relevant state laws conflicted); *see also Cole v. Gen. Motors Corp.*, 484 F.3d 717, 725-26 (5th Cir. 2007) (denying certification of express-warranty claims for lack of predominance and noting that "Plaintiffs' largely textual

---

[40] Plaintiffs do not conduct a choice-of-law analysis, but instead seem to assume that the warranty laws of putative class members' home states would govern. (*See* Mem. at 9-10 & Ex. 1.) Under Illinois's choice-of-law rules, the law of the jurisdiction with the most significant contacts with the transaction and parties applies. *See Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659, 669 (N.D. Ill. 2005). Because a choice-of-law analysis does not point to application of only one state's laws, the lack of unison among the 16 states is both material and fatal to certification. *See Siegel*, 256 F.R.D. at 585 (N.D. Ill. 2008) (explaining that "lack of unison in the case law would be immaterial . . . if the applicable choice-of-law analysis points to only one state's law").

presentation of legal authority oversimplified the required analysis and glossed over the glaring substantive legal conflicts among the applicable laws of each jurisdiction").

### C.    A Class Action Is Inferior to Other Available Methods for the Fair and Efficient Adjudication of This Controversy

Plaintiffs have failed to prove that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Under Rule 23(b)(3)'s superiority prong, the Court should address the difficulties likely to be encountered in managing the proposed class action and the interests of individual class members in controlling separate actions. *See id.* Certification is not proper unless the class device is the "best" method to resolve claims. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1191 (2013).

Plaintiffs' Motion proposes to resolve in a single class action four different claims that implicate 18 different state's laws on behalf of five different damages classes. When these complexities are considered alongside the Ovens' 63 materially-different designs, three materially different warranties, countless alternative causes of tripping, and the many additional individualized legal and factual inquiries that are relevant to each owner's claims and to Whirlpool's affirmative defenses (*see* Argument, Part II.B., *supra*), it is clear that Plaintiffs' proposed litigation "embodies a trial court's nightmare of a litigation monster." *In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 326 (S.D. Ill. 2007).

Any attempt to try, in a single class action, the disparate claims of every Oven owner would become unmanageable as the Court and a jury struggled to cope with these countless individual issues and the differing states' laws, thus overwhelming any benefit that might be derived from class-action treatment.[41] *See In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir.

---

[41] Plaintiffs offer no help to the Court. They provide no trial management plan, and although they suggest that this Court could subclass away any "complications" arising "from the design changes and from separate state warranty laws" (Mem. at 20, 24 n.10), they do not explain how the inclusion of an untold

41

1996) (concluding that superiority had not been satisfied where a "single litigation addressing every complication in every model of prosthesis, including changes in design, manufacturing, and representation over the course of twenty-two years, as well as the unique problems of each plaintiff, would present a nearly insurmountable burden on the district court").

On the other hand, the very small minority of Oven owners who have experienced tripping and who are not satisfied with the solutions offered by Whirlpool's Customer eXperience Center [42] can seek redress through their states' small-claims courts, which typically have jurisdiction to hear claims if the amount in controversy is below a set amount. *See, e.g.*, Ill. Sup. Ct. R. 281; S.C. Code Ann. § 22-3-10. Those courts employ simplified procedures so that claims can be adjudicated in an efficient, cost-effective manner without the need for lawyers. Owners who have viable claims, thus, have readily-available methods for resolving their disputes that are fairer, more efficient, and less costly than this proposed class action.

Accordingly, Plaintiffs fail to satisfy Rule 23(b)(3)'s superiority requirement. *See, e.g.*, *Pastor v. State Farm Mut. Auto. Ins. Co*, 487 F.3d 1042, 1047 (7th Cir. 2007) (explaining that it is inappropriate to certify a class dominated by individual issues because "there would be no significant economies from consolidating the class members' tiny claims" and noting that putative class members can "seek their remedies in small-claims courts"); *Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 238 (S.D. Ill. 2011) (explaining that class certification was unacceptable because, *inter alia*, "class members who were actually aggrieved

---

number of <u>additional</u> subclasses would improve manageability. Indeed, to account for <u>just</u> the relevant design differences across brands, the Court would have to create 63 design subclasses. Proliferation of such subclasses would only inflame the manageability challenges that this case already presents.

[42] Whirlpool has strong economic incentives to work with Oven owners to reach mutually agreeable solutions in the unlikely event an Oven experiences tripping. Indeed, Whirlpool devotes substantial resources to taking care of Oven owners who experience problems both in and out of warranty. (*See* Murray Decl. ¶¶ 11, 18.)

by the [defendant's] acts have a quick, adequate and superior remedy in other more speedy venues such as, for example, a state small claims court").

## IV. PLAINTIFFS HAVE FAILED TO PROVE TYPICALITY AND ADEQUACY

Plaintiffs' motion fails for the additional reasons that they have not proved that (1) "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and (2) "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3)-(4). To satisfy Rule 23(a), Plaintiffs must show that they are "part of the class and 'possess the same interest and suffer the same injury' as the class members." *Dukes*, 564 U.S. at 348-49 (citation omitted). Plaintiffs fail to do so.

### A. Plaintiffs' Claims Are Not Typical of Any Proposed Class

Rule 23(a)(3) is satisfied only if the class representative's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . her claims are based on the same legal theory." *Oshana v. Coca-Cola Co*., 472 F.3d 506, 514 (7th Cir. 2006) (alteration in original) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)). While "some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims 'have the same essential characteristics as the claims of the class at large.'" *Id.* (quoting *Retired Chi. Police Ass'n v. City of Chi*., 7 F.3d 584, 597 (7th Cir. 1993)). Here, Plaintiffs cannot satisfy Rule 23(a)(3) without showing that each Oven in the putative class shares the same design and suffers from the same alleged defect causing them and putative class members the same injury.

Given the many material design differences between and within the three Oven brands and the rarity of fuse tripping among Ovens, there is no basis to assume that all Ovens suffer from a common defect and all putative class members shared the same injury. *See, e.g.*, *Am. Med. Sys.*, 75 F.3d at 1082 ("[E]ach plaintiff used a different model, and each experienced a

distinct difficulty. . . . These allegations fail to establish a claim typical to each other, let alone a class."). And Plaintiffs have offered no credible evidence to the contrary. Here, the only similarities between Plaintiffs and the putative class members is that they all bought a Whirlpool-built oven on the Vision II platform at some point in the past 18 years in one of 18 states. This is not enough. *See Retired Chi. Police Ass'n*, 7 F.3d at 597 ("[F]or effective representation of a class, the named representatives' claims must have the same essential characteristics as the claims of the class at large." (quotation marks omitted)).

For instance, Ms. Kljajic is the sole proposed representative for the Multi-State and Illinois Damages Classes that are defined to include <u>all</u> Ovens. But Ms. Kljajic owns an IKEA-brand Oven, which differs in a number of material respects from 97% of the putative class who did not own an IKEA-brand oven. (Ohlsson Decl. ¶ 23.) And, unlike the vast majority of buyers, Ms. Kljajic's Oven failed the first time she ran the self-clean cycle. (*Id.* ¶ 59.) Moreover, because there are 10 materially-different designs within the IKEA-brand and three materially different warranties, Ms. Kljajic's claims also are not even typical of the narrower IKEA-only classes.

### B. Plaintiffs' Claims Are Vulnerable to Unique Defenses

A named plaintiff who is vulnerable to a unique defense is not an adequate class representative. *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011); *see also CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) (explaining that "[t]he presence of even an arguable defense peculiar to the named plaintiff" may cause the named plaintiff to "become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer"). Plaintiffs cannot meet the typicality requirement because their respective claims are subject to unique factual defenses.

For example, Ms. Kljajic's ICFA and warranty claims are vulnerable to unique defenses. To succeed on an ICFA claim, a plaintiff must establish that their injuries were proximately

caused by the defendant's allegedly deceptive conduct. *See De Bouse*, 922 N.E.2d at 313. But Ms. Kljajic's ICFA claim will likely fail because she admits that (1) she was not exposed to any pre-purchase misrepresentations or omissions (*see* Statement of Facts, Part III.B.2, *supra*), and (2) many factors unrelated to the self-clean feature on her Oven influenced her purchase decision (*id.*). *See De Bouse*, 922 N.E.2d at 314, 318-19 (reversing denial of summary judgment on ICFA claim where the plaintiff acknowledged that she neither saw advertising nor knew anything about the product at issue before purchasing it); *Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825, 833-34 (N.D. Ill. 2009) (St. Eve, J.) (granting summary judgment on ICFA claim because, *inter alia*, the plaintiff's testimony that "he purchased gasoline for many different reasons undermine[d] any notion" that defendants' allegedly deceptive conduct caused him to purchase the gasoline in the first instance).

In addition, Ms. Kljajic's warranty claims are vulnerable to unique defenses because the evidence shows that her Oven was not installed pursuant to Whirlpool's published installation instructions (Taylor Rep. ¶¶ 83, 94), a problem that is known to cause the safety fuses to trip during the self-clean cycle (*see* n.6, *supra*), and that is not covered by her five-year limited warranty. *See Snyder v. Komfort Corp.*, No. 07 C 1335, 2008 WL 2952300, at *5 (N.D. Ill. July 30, 2008) (St. Eve, J.) (granting summary judgment on express-warranty claim where the plaintiff did not comply with the plain language of the repair-and-replacement warranty).

Ms. Cates's unjust enrichment claim, which she seeks to assert on behalf of the South Carolina Class, is similarly vulnerable to dismissal on the basis of her unique facts. Ms. Cates testified that her Oven "increased the resale value" of her home, that it worked properly for nearly a decade before she experienced any problems, and that Whirlpool reimbursed her for the cost of that out-of-warranty repair. (Statement of Facts, Part III.B.1, *supra*.) Not only is Ms.

45

Cates's claim subject to dismissal under South Carolina's eight-year statute of repose, *see* S.C. Code Ann. § 15-3-640 (2016), but a jury will likely find that Ms. Cates' cannot prove that Whirlpool's retention of any benefit conferred was inequitable, *see Gignilliat*, 684 S.E.2d at 764.

Because Plaintiffs' claims are subject to defenses that will dominate the merits of their claims, this Court should deny certification. *See, e.g.*, *Oshana* , 472 F.3d at 514 (affirming denial of certification where the plaintiff was "subject to certain specific factual defenses that undermine typicality" because she did not see any advertisements); *McIntyre v. Household Bank*, No. 02 C 1537, 2004 WL 2958690, at *7-9 (N.D. Ill. Dec. 21, 2004) (denying certification where the plaintiff was subject to a unique timeliness defense not applicable to other class members).

### C. Plaintiffs Are Not Members of the Multi-State and South Carolina Classes They Seek to Represent and, Thus, Are Not Adequate Representatives

It is well settled that the class representative "must be part of the class" that she seeks to represent. *Dukes*, 564 U.S. at 348-49; *Amchem Prod., Inc. v. Windsor,* 521 U.S. at 625-26 (1997); *Falcon*, 457 U.S. at 156. Despite this, Plaintiffs would not be members of <u>five</u> of the classes they seek to represent. Plaintiffs, thus, lack standing and cannot meet Rule 23(a)(4) with respect to those five classes.

Specifically, Ms. Kljajic seeks to represent the two Multi-State Damages Classes, and both Ms. Kljajic and Ms. Cates seek to represent the two Multi-State Injunction Classes. (Mem. at 9-10.) Those four classes are defined as "[a]ll individuals residing in the States identified in Exhibit 1 who purchased a Whirlpool Oven," with two classes being further restricted to those Ovens that were "sold by IKEA." (*Id.*) Neither Plaintiff, however, resides in any of the 16 states listed in Exhibit 1. (*See* Mem. Ex. 1.) Rather, Ms. Kljajic is an Illinois resident, and Ms. Cates is a South Carolina resident. (Second Am. Compl. ¶¶ 7, 18.) Still further, Ms. Cates bought a

46

KitchenAid-brand Oven from Queen City Appliances, so she cannot represent the Multi-State Injunction Class of "Ovens sold by IKEA."[43]

Ms. Cates also purports to represent "[a]ll individuals who <u>purchased</u> a Whirlpool Oven with a self-cleaning mechanism in the state of South Carolina." (Mem. at 9 (emphasis added).) While Ms. Cates is a South Carolina resident, she bought her Oven in <u>North Carolina</u>. (*See* Statement of Facts, Part III.B.1, *supra*.) She is, therefore, not be a part of the class she seeks to represent.

Thus, Plaintiffs lack standing to represent the Multi-State Damages Classes, the Multi-State Injunction Classes, and the South Carolina Class and cannot meet Rule 23(a)(4). *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09 CV 3690, 2013 WL 4506000, at *8 (N.D. Ill. Aug. 23, 2013) ("Plaintiffs fail to satisfy their burden of showing Article III standing for states in which they do not reside and/or did not purchase the products at issue").

## V. PLAINTIFFS' ALTERNATIVE REQUEST FOR CERTIFICATION UNDER RULE 23(B)(2) FAILS

Plaintiffs seek, in the alternative, certification of an injunction class under Rule 23(b)(2). (Mem. at 9-10, 34-35.) Rule 23(b)(2) permits class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) certification is inappropriate here.

First, while Plaintiffs claim that their proposed Rule 23(b)(2) class is limited to those "class members here who have not had to get their Ovens serviced because the self-cleaning

---

[43] Ms. Cates did buy her Oven in North Carolina—one of the 16 states at issue—but Plaintiffs' proposed Multi-State Injunctive Classes are defined as "residents" of those states, which Ms. Cates is not. Moreover, even assuming that Ms. Cates's purchase in North Carolina is sufficient to confer standing on behalf of other North Carolina residents, it does not confer her standing for the other 15 states. *See Baldwin*, 78 F. Supp. at 731–35 (finding that plaintiffs needed a representative from each state to proceed on claims under each state's laws).

feature has not failed and broken their Ovens, but might in the future" (Mem. at 34-35), their proposed class <u>definitions</u> are not so limited.[44] Rather, Plaintiffs define their two injunction classes as "[a]ll individuals residing in the States identified in Exhibit 1 who purchased a Whirlpool Oven with a self-cleaning mechanism." (*Id.* at 9-10.) In other words, Plaintiffs' proposed injunction classes include those owners whose Ovens have experienced tripping who, according to Plaintiffs, "require the award of damages to make them whole." (*Id.* at 35.) Such an overbroad class fails to satisfy Rule 23(b)(2) because that rule "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 564 U.S. at 360-61. Rather, "individualized monetary claims belong in Rule 23(b)(3)." *Id.* at 362.

Second, Plaintiffs cannot satisfy Rule 23(b)(2) because they "cannot satisfy the test for a remedy in equity," which requires a showing that "the plaintiffs have suffered irreparable harm" and "that monetary damages are inadequate to remedy the injury." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011). Since filing their original complaint, Ms. Kljajic and Ms. Cates consistently have sought monetary relief. (*See, e.g.*, Second Am. Compl. ¶¶ 92, 120, 141.) As a result, Plaintiffs cannot now claim that such monetary relief would be inadequate to remedy their alleged injuries. *See Kartman*, 634 F.3d at 892 (reversing class certification under Rule 23(b)(2) where plaintiffs' injury, underpayment of their insurance claims, was "easily remedied by an award of money damages, a fully adequate remedy").[45]

---

[44] This decision does not seem accidental, as Plaintiffs' propose their Rule 23(b)(2) classes <u>in the alternative</u>. Had they really intended to divide purchasers into two classes and ensure that "[t]he relief sought on behalf of the (b)(2) subclasses is not duplicative of the monetary damages sought on behalf of the putative (b)(3) class members" (*id.* at 35), Plaintiffs would simply sought two different classes.

[45] *See also Mednick*, 2016 WL 3213400, at *8 (declining to certify a class under Rule 23(b)(2) because plaintiffs failed to satisfy the test for a remedy in equity where "monetary damages would adequately remedy any injury suffered by an individual member or the class as a whole"); *Marshall v. H & R Block Tax Servs. Inc.*, 270 F.R.D. 400, 406 (S.D. Ill. 2010) (declining to certify a class under Rule 23(b)(2)

Nor can they establish that their proposed injunction—presumably a declaration that there is an inherent design flaw[46]—would provide "final" relief as required by Rule 23(b)(2). "An injunction is not a final remedy if it would merely lay an evidentiary foundation for subsequent determinations of liability." *Id.* at 893. Here, because there are numerous causes of tripping that have nothing to do with the Oven's design, a putative class member would still have to prove causation and other warranty requirements prior to being entitled to any relief. *See id.* (rejecting Rule 23(b)(2) class where "class-wide [injunctive relief] would only initiate thousands of individualized proceedings to determine breach and damages"); *see also Dukes*, 564 U.S. at 360 ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.").

Finally, even if Plaintiffs' Multi-State Injunction Classes are limited to only those owners whose "self-cleaning feature has not failed and broken their Ovens," Plaintiffs still cannot satisfy Rule 23(b)(2) because they lack standing.[47] (Mem. at 34-35.) Their Ovens "have already manifested defects" (*id.* at 35) and, thus, they have not suffered "the same injury" as members of the putative injunction classes, *Dukes*, 564 U.S. at 348-49. Nor do Plaintiffs "possess the same interest" as those members. *Id.* As Plaintiffs explain, purchasers whose Ovens have not failed "would want declarations that there is an inherent design flaw, that the warranty extends to them and specific performance of the warranty to replace the [Ovens] when they manifest the defect."

where plaintiffs' amended complaint made clear that the final form of relief sought was monetary).

[46] Plaintiffs do not specify exactly what injunctive relief they seek. Instead, they rely on *Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010), a pre-*Dukes* decision in which the plaintiffs sought two different classes (not in the alternative) and articulated the precise injunctive relief sought. (*Compare* Mem. at 35, *with Saltzman v. Pella Corp.*, 257 F.R.D. 471, 475 n.3 (N.D. Ill. 2009).) Plaintiffs' vague request is insufficient. *See Jamie S.*, 668 F.3d at 499.

[47] The class also fails because it would not be ascertainable. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015).

(Mem. at 34-35 (quoting *Pella*, 606 F.3d at 392).) But neither Ms. Kljajic nor Ms. Cates would like such a declaration; "they require the award of damages to make them whole." (*Id*. at 35.)

## VI.   PLAINTIFFS' ALTERNATIVE REQUEST FOR CERTIFICATION OF AN ISSUES-ONLY CLASS FAILS

Plaintiffs also request, in the alternative, that this Court certify "all issues subject to common proof in accordance with Rule 23(c)(4)." (Id. at 10.) By seeking certification of every issue that supposedly is subject to common proof, Plaintiffs' Rule 23(c)(4) request is little more than a transparent attempt to circumvent predominance. But Rule 23(c)(4) cannot be used as an end-run around Rule 23(b)(3). *See Castano v. Am. Tobacco Co.,* 84 F.3d 734, 745 n. 21 (5th Cir. 1996) ("A district court cannot manufacture predominance through the nimble use of [Rule 23](c)(4)."); *see, e.g.*, *Rhone-Poulenc Rorer*, 51 F.3d at 1297 (decertifying Rule 23(c)(4) class as "so far exceed[ing] the permissible bounds of discretion in the management of federal litigation" where it was not "feasible" to certify that class under Rule 23(b)(3)).[48]

*Butler* does not mandate a different result. (*See* Mem. at 33.) The Seventh Circuit merely held that a liability-only class was appropriate where predominance was satisfied. *See Butler II,* 727 F.3d at 800. Because Plaintiffs' proposed classes fail to satisfy Rule 23's predominance and superiority requirements, as demonstrated above, class treatment of "particular issues" that neither predominate nor advance this litigation is inappropriate. (Mem. at 34.)

## CONCLUSION

For all the foregoing reasons, Plaintiffs' motion for class certification should be denied.

---

[48] There is disagreement among the district courts regarding whether the predominance inquiry in the 23(c)(4) context focuses only on the individual issues for which class treatment is sought or requires consideration of the cause of action as a whole. *See Yasmin*, 275 F.R.D. at 278 n.2. This disagreement is immaterial here where "individual questions of law and fact predominate the putative common issues as well as the case as a whole." *Id.*

Dated:  November 17, 2016               Respectfully submitted,

                                  Whirlpool Corporation

                     By   */s/ Andrew M. Unthank*

Andrew M. Unthank
(Federal Bar ID No. 36832)
Erin F. Frohardt
(Federal Bar ID No. 47182)
Laura J. McNabb
(Federal Bar ID No. 44853)
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Telephone:  (303) 244-1800
Facsimile:  (303) 244-1879
Email:   unthank@wtotrial.com
         frohardt@wtotrial.com
         mcnabb@wtotrial.com

Bradley B. Falkof
(Il. Bar No. 3121697)
Barnes & Thornburg LLP
One North Wacker Drive, 44th Floor.
Chicago, Ill. 60606
Telephone: (312) 357-1313
Facsimile: (312) 759-5646
Email: Brad.Falkof@btlaw.com

Attorneys for Defendant Whirlpool
Corporation

<u>**CERTIFICATE OF SERVICE (CM/ECF)**</u>

The undersigned certifies that on November 17, 2016, a true and correct copy of the

foregoing **DEFENDANT WHIRLPOOL CORPORATION'S BRIEF IN OPPOSITION TO**

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** was filed with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing on all counsel of

record who are participants in the Court's CM/ECF system.

Andrew M. Unthank